[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 515 
These appeals arise out of an action by Tys. S. and her sister, Tyr. S., by and through their paternal grandmother and next friend Goldia Davis (sometimes referred to as "the plaintiffs"), against Kenneth Gowens and Charity Rose — employees of the Jefferson County Department of Human Resources ("the JCDHR") — alleging that they were injured as the result of Gowens and Rose's failure to act properly on a report of suspected child abuse and neglect. In case no. 1041413, the plaintiffs appeal from a summary judgment in favor of Rose; in case no. 1041341, Gowens appeals from the denial of his motion for a summary judgment. See Ala. R.App. P. 5, We affirm.
 I. Factual Background
On September 18, 2000, Tymisha Green S., Tys. and Tyr.'s mother, gave birth to M.B., the half sister of Tys. and Tyr., at the University of Alabama at Birmingham Hospital ("the hospital"). Medical tests revealed the presence of cocaine in both Tymisha and M. Subsequently, pursuant to the Child Abuse Reporting Act, Ala. Code 1975, § 26-14-1 et seq.
("CARA"), a social worker at the hospital ("the reporter") reported the incident to JCDHR "intake worker" Joan McPhearson, who documented the report on three forms: Forms 1591 and 1592, entitled "Alabama Department of Human Resources Report of Suspected Child Abuse/Neglect" and Form 1924A, entitled "High Risk Protocol Part A" (the three forms are referred to collectively as "the September CAN report"). The September CAN report was signed by McPhearson and dated September 19, 2000.
The September CAN report listed "Tymisha [S.]" as the mother, and stated: "Mother and baby tested positive for cocaine. Mother goes home on 9-20-00. Mother also has 2 yr. old niece or nephew in the home — reporter stated [Department of Human Resources] placed child there." Elsewhere, it stated: "Mo[ther] ch[ild] tested pos[itive] for cocaine. Mo[ther] to be released 9-20-00 — 3 other children in the home." (Emphasis added.) The September CAN report specifically listed three "child victims," namely, M.B., Tyr. S., and Tys. S. It also included their dates of birth, indicating that Tyr. and Tys. were 8 years old and 7 years old, respectively, at that time. The September CAN report assigned code numbers to each of the three children, identifying the purported risk of harm to each child. The code number assigned to M. was "N-61," meaning "Substance Abuse Due to Neglect"; the code number assigned to Tys. and Tyr. was "P-23," which means "Substantial Risk of Physical Injury (Abuse)." Finally, the September CAN report listed "Yvonne Green," the children's "maternal grandmother," as a person having "information" regarding the children.
The day she received the report, McPhearson visited the office of Charity Rose, who was serving the JCDHR as a "senior social work supervisor," and informed *Page 517 
Rose of certain details of the September CAN report, including the fact that Tymisha's household included a niece or nephew. Rose assigned the case to her subordinate, Kenneth Gowens, an investigative social worker, and instructed him to go to the hospital to begin an investigation.
At the hospital, Gowens talked to Tymisha and to Cornelius B., M.'s father, as well as to the reporter. According to Gowens, Tymisha told him that M. was the only child in her household. He also alleges that Tymisha agreed to submit to a proposed "safety plan," which would include "an in-depth assessment" by a mental-health professional, random drug testing, and parenting classes. From the hospital, Gowens telephoned Rose and apprised her of the proposed safety plan, and she orally approved it.
There was some contact between Tymisha and the JCDHR during the following weeks. On October 10, 2000, Gowens received a report from Pearson Hall, a substance-abuse treatment facility, indicating the results of an interview with Tymisha. That same day, Gowens spoke with Tymisha by telephone, and they discussed apparent discrepancies between her statements to the interviewer at Pearson Hall and those she allegedly made to Gowens at the hospital regarding the extent and nature of her substance abuse. On October 16, 2000, Tymisha visited Rose in Rose's office and provided the results of a drug screen. That visit was the last time either Rose or Gowens spoke to Tymisha until January 2001.
In the meantime, on October 30, 2000, Gowens attempted to visit Tymisha at her home, but was unable to locate her residence. He also attempted to contact her by telephone, but her telephone had been disconnected. According to Gowens, by the first of November 2000, he had "lost the family." It was only later thathe discovered the existence of Tyr. and Tys., when Rose informed him that no one had yet had contact with them.
The JCDHR's first contact with Tyr. and Tys. was in January 2001, as the result of the event that prompted this action. That event was a fire that erupted at the house of Yvonne Green just after midnight on December 31, 2000, resulting in permanent injuries to Tys., who was home alone. According to Tys., she was unable to escape the flames because her "grandmother [had gone to work, and] had locked [her] in the house." Tys. was admitted to the Children's Hospital of Alabama ("Children's Hospital"), which immediately generated a child-abuse/neglect ("CAN") report identifying Yvonne Green as the perpetrator and Tys. as the victim of an alleged act of child abuse and/or neglect, namely, "inadequate supervision" ("the December CAN report").
On January 2, 2001, Gowens learned of Tys.'s injuries through a coworker. Through the aid of another coworker, Gowens located and visited the home of Tymisha's sister, who informed Gowens that Tys. was in Children's Hospital. Subsequently, Tymisha telephoned Gowens at his request made through a social worker at Children's Hospital. The following day, Tymisha and Yvonne Green visited Gowens at his office.
This time, Gowens received information on Tymisha's family from a number of her family members and relatives. In addition to Yvonne, Gowens interviewed Tyr. and Tys. According to his notes, Tys. stated that it was "not unusual for her to be [at home] alone." Tyr. told Gowens that she was "`scared' to return home to her mother's house," and "that `Cornelius [B.] and his friends come over and drink [there] and smoke reefers.'" Eventually, Gowens also met and spoke with Goldia Davis and her son, Tyrone S., Tyr. and Tys.'s father. *Page 518 
Meanwhile, on January 3, 2001, Gowens drafted a proposed "in-home safety plan" to address the needs of Tymisha's children. Under the proposed plan, Tymisha would (1) be reevaluated at Pearson Hall for substance abuse; (2) complete a three-month drug-screen program; and (3) complete a series of parenting classes. The proposed safety plan designated Yvonne Green as the "person responsible for protecting the [children] in the home." However, Rose refused to endorse the plan, because, according to her deposition, it relied on YvonneGreen to ensure the children's safety in the home, "and Yvonne Green was newly reported as an alleged perpetrator of a serious incident."
Moreover, Tyrone S. informed Gowens that Yvonne's own
children had been "removed from her due to neglect." Indeed, there were, at all pertinent times, on file with the JCDHR, records of its involvement in the custody of Yvonne's children, including Tymisha. More specifically, in 1988, the JCDHR had effected the removal of Tymisha and her siblings from Yvonne's home for "educational neglect and inadequate shelter." The conditions leading to that action were described, in pertinent part, in a JCDHR report dated January 27, 1989:
 "Reportedly, [the children] were residing in their home with no gas or water. The agency has received several complaints regarding these children.
 "Relatives expressed grave concern about the children's welfare. . . . The school complained of the children's poor attendance. [Yvonne Green] failed to provide clean clothes and occasionally she appear[ed] to be unstable. [She] was leaving children alone late at night. . . . When [the children] were removed from the home, the police [were] appalled that they were locked in and could not get out.
Police described this situation as being dangerous. The windows were also locked from the outside."
(Emphasis added.) Pursuant to a revised safety plan, the children were placed in the home of Goldia Davis on or about January 5, 2001, and "[i]t was agreed that neither Tymisha nor Yvonne would be allowed to have any unsupervised contact with the children."
During January and February, Gowens learned from various sources, including Yvonne Green, Tyrone S., and personnel at Pearson Hall, that Tymisha had not complied with the JCDHR orders. In particular, she had never enrolled in parenting classes and, since the fire, had not submitted to drug screens. Tymisha never completed a drug program, and she never became a patient at Pearson Hall. Gowens also learned that Tymisha wasfalsely reporting that she had enrolled in parenting classes. On February 23, 2001, Tymisha took M. from Davis's house, in violation of the revised safety plan.
On February 28, 2001, Gowens filed in the Jefferson Family Court dependency petitions for all three children. That court then ordered the children placed in the legal custody of Davis. In Gowens's final report on his investigation of the September CAN report and the December CAN report, he assigned code numbers to the abuse/neglect allegedly suffered by Tyr. and Tys. To Tys., he assigned code number "N-62," meaning "Inadequate Supervision (Neglect)." He found this allegation of harm to be "indicated," meaning that "credible evidence (e.g., eyewitness account, medical report, professional evaluation) and the professional judgment of the worker (based on facts gathered during the course of the initial assessment) indicate that abuse/neglect has occurred." Ala. Admin. Code (Department of Human Resources) r. 660-5-34-.06(1). He assigned code number P-23 to both Tyr. and *Page 519 
Tys., and found that allegation of harm to be "indicated" as to both children.
Subsequently, Tys. and Tyr., by and through Davis, sued Gowens and Rose, alleging that Gowens had breached a "duty to properly act upon the [September CAN report] and by failing to so act, affirmatively placed [them] in a position of danger that [they] would not have otherwise faced." They averred that Rose was "responsible for the supervision and monitoring of Defendant Gowens and for reviewing findings of suspected neglect or inadequate supervision and for ensuring that appropriate action [be] taken in response to such findings." They alleged that Rose had a "duty to properly act upon Defendant Gowens's reports of suspected child neglect by Tymisha [S.], . . . and by failing to so act, affirmatively placed [Tyr. and Tys.] in a position of danger that [they] would not have otherwise faced." They averred that as a "proximate consequence of the aforementioned conduct" of Gowens and Rose, (1) Tys. "was allowed to suffer third degree burns to her body and the amputation of her fingers on or about December [31], 2000," and (2) Tyr. was "allowed to suffer continued abuse and neglect until [Tys.] . . . suffer[ed] third degree burns to her body and the amputation of her fingers on or about December [31], 2000." Finally, they alleged that after the "near-fatal injuries suffered by Tys. . . . , as a result of the continued neglect of the minor Plaintiffs, [the minors] were removed from the custody of their mother, Tymisha [S.], in accordance with the rules and regulations of the State Department of Human Resources."
Rose and Gowens jointly moved for a summary judgment, asserting, among other things, immunity defenses. More specifically, they contended that they are affordedabsolute immunity by Ala. Code 1975, § 26-14-9, andState-agent immunity by the rule restated in Exparte Cranman, 792 So.2d 392 (Ala. 2000), and its progeny.
The trial court granted the motion as to Rose, and certified the judgment as final, pursuant to Ala. R. Civ. P. 54(b). The plaintiffs appeal from that judgment (case no. 1041413). The trial court denied the motion as to Gowens, and certified the order denying Gowens's summary-judgment motion for interlocutory appeal, pursuant to Ala. R.App. P. 5. Specifically, the trial court certified the following questions for interlocutory review:
 "1. Whether defendant Kenneth Gowens is entitled to summary judgment in his favor as to all claims asserted by [the] plaintiffs on the grounds that Gowens is immune from suit;
 "2. Whether defendant Kenneth Gowens is entitled to summary judgment in his favor as to all claims asserted by [the] plaintiffs on the grounds that Gowens owed no duty to the plaintiffs under Alabama law; and
 "3. Whether defendant Kenneth Gowens is entitled to summary judgment in his favor as to all claims asserted by [the] plaintiffs on the grounds that the plaintiffs have failed to provide substantial evidence of any injury proximately caused by any alleged breach of duty by Gowens."
This Court granted Gowens permission to appeal the denial of his summary-judgment motion (case no. 1041341) and consolidated the cases for review. We first address the issues raised by Gowens in the interlocutory appeal.
 II. Case no. 1041341
"Generally, a denial of a summary-judgment motion is not immediately reviewable by an appellate court." Ex parteHaralson, 871 So.2d 802, 805 (Ala. 2003). However, "[t]his Court has held that a Rule 5[, Ala. R.App. P.,] petition is an *Page 520 
appropriate means by which a State agency or employee can seek appellate review of an order denying a claim of immunity."Ex parte Butts, 775 So.2d 173, 176 (Ala. 2000). SeeTown of Loxley v. Coleman, 720 So.2d 907 (Ala. 1998).
 A. Immunity
Gowens contends that he is "immune from liability and suit" and that "the trial court erred in failing to grant summary judgment to [him] on the basis of state agent and statutory immunity." Gowens's brief, at 13. We first address his statutory-immunity argument.
 1. Statutory Immunity
Gowens contends that he is absolutely immune from suit
based on § 26-14-9, a provision of the CARA. Section 26-14-9
provides:
 "Any person, firm, corporation or official, including members of a multidisciplinary child protection team, quality assurance team, child death review team, or other authorized case review team or panel, by whatever designation, participating [1] in the making of a good faith report in an investigation or case review authorized under this chapter or other law or department practice or [2] in the removal of a child pursuant to this chapter, or [3] participating in a judicial proceeding resulting therefrom, shall, in so doing, be immune from any liability, civil or criminal, that might otherwise be incurred or imposed."
(Emphasis added.)
This section "grants immunity to certain persons, firms, corporations, and officials who report child abuse to the appropriate authorities." Marks v. Tenbrunsel,910 So.2d 1255, 1258 (Ala. 2005). Those "persons, firms, corporations, and officials" are cataloged in Ala. Code 1975, §§ 26-14-3 and -4, as mandatory and permissive reporters, respectively. See also Ala. Code 1975, § 26-14-2 (the purpose of CARA is to protect child victims of "abuse and neglect" through "the reporting of such cases to the appropriate authorities"). "The failure of any of the persons named in [§ 26-14-3] to report suspected child abuse subjects them to criminal sanctions. Because it requires that these individuals report child abuse, it also provides immunity to those who report." Brown v. Pound, 585 So.2d 885, 886 (Ala. 1991).
Actors whose conduct falls within the scope of §26-14-9 are entitled to "absolute immunity." 585 So.2d at 886. However, "mere compliance with [§ 26-14-9] is not an automatic grant of immunity," because "allegations of injury or damage not related to the reporting of the suspected child abuse" are outside the scope of the statute. 585 So.2d at 886. See Harris v. City of Montgomery, 435 So.2d 1207
(Ala. 1983).
According to Gowens, "[b]ecause [he] is being sued for [his]involvement in JCDHR's investigation into a [CAN] report and the ultimate decision of when to remove theplaintiffs from the care of their mother, the CARA provides [him] absolute immunity." Rose's brief, at 20-21 (argument incorporated by reference into Gowens's brief). He concedes that there is no Alabama case on point, that is, one involving the application of § 26-14-9 to claims against employees of the State Department of Human Resources ("DHR"). He contends, however, that the statute does not purport to "exclude DHR employees," or to apply "only to non-DHR employees."
The plaintiffs concede that § 26-14-9 could, under some circumstances, immunize DHR employees. They contend, however, that this is not such a case, because, they insist, they have not sued Gowens for reporting suspected child abuse, but for *Page 521 
his alleged failure "to follow mandatory regulations and policies long after receiving reports of abuse from [the hospital]." Plaintiffs' brief, at 47. Thus, they contend, Gowens's conduct in this case is outside the scope of §26-14-9. We agree.
In Harris v. City of Montgomery, supra, this Court rejected the argument of a police officer that he was entitled to statutory immunity under § 26-14-9 for claims arising out of his response to a report of suspected child abuse. The report was made to the Montgomery Police Department by Dr. Robert Wiltsie at the Baptist Medical Center, who misdiagnosed a condition of Patricia Harris's child as a case of suspected child abuse. 435 So.2d at 1210. Consequently, Officer G.M. Meads arrested Harris, confined her, and interrogated her for five hours. 435 So.2d at 1216 (Jones, J., concurring in part and concurring in the result in part). While in custody, "'[s]he was accused time and time again of child abuse and finally after a direct threat to the well-being of her child, she made a statement which included inculpatory matters.'"435 So.2d at 1215 (Maddox, J., dissenting, and quoting Harris's brief). The police officers promised Harris that "`the incident would be listed as an accident, so it would not be reported to the Department of Pensions and Security.'" Id. "`Upon leaving the interrogation room[, Harris] . . . recanted'" her confession. Id. Despite its assurances, the police department "`filed a report with the Department of Pensions and Security, . . . accusing [Harris] of child abuse,'" and created a "`permanent record at police head-quarters.'" Id.
Harris sued, among others, Dr. Wiltsie and Officer Meads. As to Officer Meads, her complaint averred, in pertinent part:
 `"22. On or about March 19, 1981, Defendant Meads . . . did take Plaintiff Patricia Harris unlawfully into custody and did unlawfully confine her in a small isolated room at Police Headquarters in Montgomery, Alabama.
 "`23. By confining her in said room, by threat of physical harm, and by threat to take her eight day old child into custody, Defendant Meads . . . did force Plaintiff Harris to involuntarily confess to child abuse and/or neglect.'"
435 So.2d at 1210.
Dr. Wiltsie and Officer Meads moved to dismiss the complaint, asserting the defense of statutory immunity under § 26-14-9. The trial court granted the motions, and Harris appealed. On appeal, this Court affirmed the judgment of dismissal as to Dr. Wiltsie, holding that he came "within the purview of §26-14-9 and [was] immune from suit." 435 So.2d at 1214. As to Officer Meads, however, this Court reversed the judgment and remanded the cause for further proceedings, explaining: "There are allegations of false imprisonment, false arrest, and, apparently, defamation in the complaint, i.e., allegations of tortious conduct on the part of the officer beyond thoseactions protected by the immunity statute. This conduct, if proved, would remove the officer from the purview of § 26-14-9." 435 So.2d at 1212 (emphasis added).
In this case, the plaintiffs' theory of liability is that Gowens conducted a negligent investigation of the September CAN report. More specifically, they allege that Gowens breached mandatory rules and procedures governing the investigation of reports of suspected child abuse and consequently failed to discover the existence of and to interview Tyr. and Tys. in time to prevent injuries they allegedly incurred while in their mother's custody. Tyr. and Tys. have not asserted in their action against Gowens that his allegedly wrongful conduct occurred while he was (1) "making . . . a good faith report," (2) removing a *Page 522 
child, or (3) participating "in a judicial proceeding resulting therefrom." Thus, Gowens's challenged conduct does not fall within the purview of § 26-14-9,[1] and he is not entitled to absolute immunity. We next consider the application of the principles of State-agent immunity announced in Exparte Cranman, supra, and adopted in Ex parteButts, supra.[2]
 2. State-agent Immunity
Recently, we said:
 "State agents are `"immune from civil liability"' in their personal capacities for negligence and wantonness, when the challenged conduct involves the exercise of judgment (1) in the administration of a government agency or department, including `"allocating resources,"' and `"hiring, firing, transferring, assigning, or supervising personnel"'; or (2) in `"the discharge of duties imposed by statute, rule, or regulation in . . . counseling or releasing persons of unsound mind. . . ."' Howard v. City of Atmore, 887 So.2d 201, 204-05 (Ala. 2004) (quoting [Ex parte] Cranman, 792 So.2d [392] at 405 [(Ala. 2000)]). See also Giambrone v. Douglas, 874 So.2d 1046
(Ala. 2003). Immunity also attaches to conduct involving the `"formulat[ion of] plans [or] policies,"' and to conduct involving the discharge of governmental duties imposed `"by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner:" Howard, 887 So.2d at 204-05
(quoting Ex parte Cranman, 792 So.2d at 405)."
Vick v. Sawyer, 936 So.2d 517, 523 (Ala. 2006) (first emphasis original; other emphasis added).
 "Moreover, `[w]e have established a "burden-shifting" process when a party raises the defense of [S]tate-agent immunity.' Giambrone [v. Douglas], 874 So.2d [1046] at 1052 [(Ala. 2003)]. Under this process, [Gowens] `bear[s] the burden of demonstrating that [the plaintiffs'] claims arise from a function that would entitle [him] to immunity.' 874 So.2d at 1052. `If [he makes] such a showing, the burden then shifts to [the plaintiffs], who, in order to deny [Gowens] immunity from suit, must establish that [Gowens] acted willfully, maliciously, fraudulently, in bad faith,' 874 So.2d at 1052, or that he `was not exercising his . . . judgment in the manner set forth in the examples in Cranman.' Ex parte Hudson, 866 So.2d [1115, 1118 (Ala. 2003)]."
Howard v. City of Atmore, 887 So.2d 201, 205 (Ala. 2004).
Gowens contends that he is entitled to State-agent immunity, because, he insists, he is "being sued for exercising hisdiscretion and professional judgment in determining if and when to remove the *Page 523 plaintiffs from the care of their mother in response to allegations of suspected child abuse or neglect." Gowens's brief, at 13 (emphasis added). There was ample testimony by affidavit and deposition indicating that, at all pertinent times, Gowens was operating within the line and scope of his employment by the JCDHR as a "Service Social Worker — Licensed." An employee in that position investigates "child and adult abuse cases"; "assess[es] need and delivery of services"; "[d]iagnoses, formulates, and develops . . . service plan[s] for client needs"; and "arranges suitable placement for child[ren] . . . through legal intervention." The evidence was sufficient to shift the burden to Tys. and Tyr. to show that Gowens "acted willfully, maliciously, fraudulently, in bad faith,"Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala. 2003), or that he "was not exercising his . . . judgment in the manner set forth in the examples in Cranman." Ex parte Hudson,866 So.2d 1115, 1118 (Ala. 2003).
Tys. and Tyr. do not contend that Gowens "acted willfully, maliciously, fraudulently, [or] in bad faith." Instead, they contend that Gowens's purported investigation of the September CAN report did not comply with mandatory JCDHR rules and regulations and, therefore, that he was not exercising judgment or discretion as required by Cranman.
Specifically, they rely on rules promulgated by DHR in Chapter VII of the State of Alabama Department of Human Resources Family and Children's Services Manual, entitled, "Protective Services for Children" ("the DHR Manual"). According to the affidavit of Shirley Scanlan, DHR's "Program Manager of the Office of Child Protective Services":
 "[The DHR Manual] constitutes written [DHR] policy and procedure with respect to the provision of Child Protective Services. The various DHR county departments are required to provide [the DHR Manual] to social workers, supervisors and other employees involved in the provision of Child Welfare Services, including the investigation of reports of child abuse and neglect . . ., and to train and instruct those employees to provide services in accordance with [the DHR Manual's] provisions. Thus, [the DHR Manual] is the primary set of written rules and guidelines which governs the DHR county departments' receipt, response, investigation, disposition, and reporting of reports of suspected child abuse or neglect.
 "5. [The DHR Manual] includes certain specific requirements and rules that govern the manner in which a report of suspected child abuse or neglect must be received, processed, investigated, disposed of, and reported, depending on the specific factual circumstances involved in a particular report."
(Emphasis added.) Moreover, Gowens concedes that "his obligations with respect to [his investigation of the September CAN report are] defined by the [DHR Manual]." Gowens's brief, at 64.
Subsection VI, "Investigative Standards," of the DHR Manual states, in pertinent part:
 "The standards for completing an investigation are as follows:
 ". . . .
 "The worker must conduct group or individual, in-person interviews with all verbal children and observe all non-verbal children while awake who are in the home within the time frames as listed above. The worker must verify the number of children in the household from an outside source. This source may be relatives, neighbors, friends or agency records such as eligibility or child support records. Verification must be documented in *Page 524 
the CAN record. If, after all efforts have been exhausted to obtain verification of the number of children in the household and these efforts have failed, the worker must document in the CAN record that verification could not be obtained as well as efforts to obtain verification.
 ". . . .
 "In most cases a private interview with the child who is the subject of the [CAN] report is essential to the investigation.
 ". . . .
 "All other children who are regular members of the household shall also be interviewed in-person, either individually or in a group for the purposes of carefully assessing the potential harm or danger to these children and/or obtaining information regarding the alleged abusive/neglectful incident. When a child has been abused/neglected by a parent/caretaker, the worker must carefully assess the danger to other children in the household and take action to address the protection of these children if they are found to be endangered.
 "Information to be obtained from other children in the home includes:
 "what happened and how they obtained the information;
 "whether they have been abused/neglected
— if yes, how, when, where, how often and for how long;
 "information on the child victim — the effects of abuse/neglect, unusual or extreme behavior by the victim; e.g., extreme withdrawal from or fear of parent, self-mutilation, etc. and the victim's relationship with parents;
 "information about the parents; e.g., behaviors frequently exhibited, needs and strengths, child-rearing methods and parents' relationships outside the home; and,
 "information about the family dynamics; e.g., demographic information on the family, family characteristics and interaction, and family functioning."
(Emphasis added.)
Tys. and Tyr. insist that there is substantial evidence indicating that Gowens and Rose knew that Tyr. and Tys. were members of Tymisha's household on, or about, September 19, 2000, based on the September CAN report prepared by McPhearson, which listed them by name as "child victims," and stated that there were "3 other children [besides M. and including a niece or nephew] in the home." (Emphasis added.) Tyr. and Tys. contend that Gowens, armed with the September CAN report, had a mandatory duty to interview them in a timely manner and that such an interview in this case would have led inexorably to their removal from Tymisha's custody before Tys. was injured in the fire. Thus, they argue, Gowens's failure to interview them was not an exercise of judgment for which he would be entitled to immunity under the Cranman rule.
In cases applying the Cranman rule, "this Court has held what was clearly implied in Cranman, namely, that a `State agent acts beyond authority and is therefore not immune when he or she "fail[s] to discharge duties pursuant to detailed rules or regulations,such as those stated on a checklist."'" Howard,887 So.2d at 208 (quoting Giambrone v. Douglas,874 So.2d at 1052, quoting in turn Ex parte Butts, 775 So.2d at 178
(emphasis added in Howard)). The "checklist" exception to State-agent immunity was illustrated in Giambrone
and Howard.
 "The complaint in Giambrone sought compensation for injuries suffered by 15-year-old Jake Giambrone, a member of the wrestling team, in an impromptu *Page 525 
wrestling match with Michael Douglas, the head wrestling coach for Auburn High School. 874 So.2d at 1049. Douglas outweighed Giambrone, who was a freshman, by approximately 70 pounds. Id.
The trial court entered a summary judgment in favor of Douglas on the ground of State-agent immunity.
 "In this Court, the appellant argued that the summary judgment was improper, because there was evidence indicating that `[Douglas] violated the competition guidelines as promulgated by the National Federation of Wrestling ("NFW"); and . . . engaged in "inequitable competition" with Jake in violation of the code of conduct contained in the Alabama High School Athletic Directors and Coaches Association Directories ("the Athletic Directories").' 874 So.2d at 1051 (emphasis added). This Court agreed with that argument and reversed the summary judgment. 874 So.2d at 1057.
 "In doing so, the Court noted that, as a general principle, `Douglas was permitted to exercise broad judgment in the education of his students.' 874 So.2d at 1053. It explained, however, that Douglas's supervisor, the athletic director, had `instructed the coaches . . . to follow the guidelines in the Athletic Directories,' and that he had `provided Douglas with a book containing rules promulgated by the NFW in order to make sure that Douglas knew the rules for conducting wrestling matches.' 874 So.2d at 1054. The Court stated:
 "`Although [the athletic director] was not directed by the [Auburn City Board of Education] to impose on the coaches at Auburn High School the guidelines and rules of the . . . NFW and the Athletic Directories, it was within the exercise of his judgment to "insist" that the coaches comply with those guidelines and rules.
 "`Therefore, Douglas's "broad authority" to exercise judgment in the safe conduct of his wrestling team practices was limited by the guidelines and rules furnished and imposed by [the athletic director].'
 "874 So.2d at 1054. The Court concluded:
 "`The guidelines and rules removed Douglas's judgment in determining whether he should participate in a "full speed" challenge match with a student who was less experienced, much younger, and smaller than Douglas. Moreover, the guidelines and rules restricted the type of moves that are permissible in the sport of wrestling. Because a trier of fact could determine that Douglas performed an illegal move during an "inequitable" challenge match, thereby failing to discharge his duties pursuant to "detailed rules or regulations," we cannot determine at this stage in the proceedings that Douglas is entitled to State-agent immunity. Douglas did not meet his burden of establishing that his actions and decisions involved functions that entitled him to immunity.'"
Howard, 887 So.2d at 208 (emphasis added inHoward).
More recently, in Howard we considered the claims of Gladys Howard against police officer/dispatcher Frank Bryars for the death of Howard's sister, Marilyn Bowens, who committed suicide while she was incarcerated in the City of Atmore jail.887 So.2d at 202. We agreed with Howard's theory of the case that Officer Bryars was not entitled to State-agent immunity, "because . . . he failed to follow mandatory rules andprocedures prescribed by the . . . police department for observing inmates," which were set forth in the "`Standard *Page 526 
Operating Procedures Manual'" ("the SOP"). 887 So.2d at 206.
The dispositive provision of the SOP stated, in pertinent part:"'The dispatcher on duty shall make periodic jail checks oninmates at least twice an hour and more often if needed or circumstances call for additional checks. The monitor camerawill constantly be operating and observed by dispatchers.'"887 So.2d at 207 (emphasis added in Howard). There was testimony that Officer Bryars had "made a `jail check' on all the inmates when he arrived at 3:00 p.m. to begin his shift," and "that he saw Bowens on the `monitor camera' [only]once between 3:00 p.m. and 4:08 p.m.," when she was discovered "hanging from the bars" of her cell.887 So.2d at 209. Thus, summary judgment for Officer Bryars was inappropriate, in the face of evidence indicating that he "failed to comply with [the SOP], which require[d him] to make `jail checks' of all inmates at least twice per hour, and `constantly' to observe the `monitor camera.'"887 So.2d at 209 (first emphasis added).
Gowens argues that the plaintiffs' reliance on information contained in the September CAN report regarding the number of children in the home is misplaced. This is true, because, he insists, there is no evidence as to when he actuallysaw that report, and knowledge of the report or its contents cannot be imputed to him for purposes of piercing the shield of State-agent immunity. We agree.
Although "[a]s against a principal, both principal and agent are deemed to have notice of whatever either has notice of," Ala. Code 1975, § 8-2-8 (emphasis added), the imputation of the principal's knowledge to the agent is contrary to the general principles of agency. Schmitt v.FMA Alliance, 398 F.3d 995, 997 (8th Cir. 2005) (citing cases); Waswick v. Stutsman County Bank (In reWaswick), 212 B.R. 350, 352-53 (Bankr.D.N.D.1997); andRosenbaum v. Texas Energies, Inc., 241 Kan. 295, 300,736 P.2d 888, 892 (1987). Indeed, imputed knowledge will not defeat State-agent immunity, because it does not bespeak bad faith or deviation from "detailed rules or regulations, such as those stated on a checklist." Ex parte Butts,775 So.2d at 178. Thus, in the absence of evidence indicating that Gowens actually possessed the information in the September CAN report regarding the number of children in the home, the plaintiffs must identify a mandatory rule or regulation requiring Gowens independently to discover that information.
It is in this connection that the plaintiffs cite that portion of the DHR Manual containing "standards for completing an investigation." In particular, they insist that Gowens failed to "verify the number of children in [Tymisha's] household from an outside source" (emphasis added), and to interview Tyr. and Tys. as required by the DHR Manual. In other words, they contend that, because Gowens failed to "verify" Tyr. and Tys.'s existence before the December fire, his purported investigation of the September CAN report did not involve the exercise of judgment or discretion necessary to invoke State-agent immunity. We agree.
Gowens was indisputably subject to the DHR Manual, which prescribed in detail some of the fundamental steps in his investigation of the September CAN report. Regardless of when Gowens actually became privy to the information supplied by McPhearson, the DHR Manual mandated that he "verify the number of children in the householdfrom an outside source." (Emphasis added.) According to the DHR Manual, the "outside source" could be "relatives, neighbors, friends or agency records such as eligibility or child support records." In other words, the "outside *Page 527 
source" could not be the alleged perpetrator of the abuse.[3]
The evidence demonstrates that Gowens did not comply with this fundamental mandate. Although he testified that he did
ask Tymisha whether there were other children in her household, the evidence is that he asked that question of noone else. Gowens conceded that he did not ask, or seek, that information from Cornelius B., M.'s father, who was present at the hospital when Gowens talked to Tymisha. Even assuming that Cornelius was present — and remained silent — when Tymisha allegedly denied the existence of Tyr. and Tys;, his silence was immaterial in the absence of a direct question posed to him or a duty to speak; he was not Tyr. and Tys.'s father. The failure to meet this threshold requirement of verification led, of course, to the further failure tointerview Tyr. and Tys., as is also required by the DHR Manual. Discovery of the existence of Tyr. and Tys. would have imposed upon Gowens the duty to ask Tyr. and Tys. the specific, detailed questions set forth in the DHR Manual, including whether they had been abused or neglected and the circumstances of any such abuse or neglect. The required inquiry would have revealed information about the "child-rearing methods" of the parents, the "family dynamics," and the family "demographic[s]."
The DHR Manual simply does not confer upon the investigator of a CAN report the judgment or discretion to limit this crucial inquiry to asking questions of the alleged perpetrator. The mandates of the DHR Manual in this regard are precisely the sort of "detailed rules or regulations" that State agents cannot ignore, except at their peril. For these reasons, Gowens is not entitled to State-agent immunity. We next address the second question certified for interlocutory review — whether Gowens is entitled to summary judgment on the ground that he owed Tyr. and Tys. no duty under Alabama law.
 B. Duty
Gowens contends that the plaintiffs' claims are all "based upon alleged breaches of duties imposed by the CARA," and that the CARA affords no private right of action. Gowens's brief, at 65-66. He argues "that any duties owed under [the CARA] are duties owed solely to the State or to the public in general, not to individual plaintiffs." Gowens's brief, at 16.
The plaintiffs, however, insist that the CARA created a "special relationship" between them and the JCDHR, requiring Gowens to exercise due care to conduct a thorough investigation of the September CAN report, and that the breach of that duty is actionable by them. We agree.
"Certainly, a duty of care can arise from a statute. . . ."Carter v. Chrysler Corp., 743 So.2d 456, 463-64
(Ala.Civ.App. 1998).
 "A legal duty is `an obligation arising from a contract of the parties or the operation of the law.' Black's Law Dictionary 804 (5th ed.1979).
 "A legal duty to exercise care, therefore, arises where the parties are bound by contract, Pugh v. Butler Telephone Co., [512 So.2d 1317
(Ala. 1987)], or where the obligations are `expressly or impliedly imposed by statute, municipal ordinance, or by administrative rules or regulations, or by judicial decisions.' 57 Am.Jur.2d, Negligence § 36 at 382 (1988)."
King v. National Spa Pool Inst, Inc.,570 So.2d 612, 614 (Ala. 1990) (emphasis *Page 528 
added). See also Thompson v. Mindis Metals, Inc.,692 So.2d 805, 807 (Ala. 1997) ("A legal duty arises either from the common law or from a statute."). "`The existence of a duty is a question of law to be determined by the . . . court.'"Wal-Mart Stores, Inc. v. Smitherman, 872 So.2d 833, 837
(Ala. 2003) (quoting Ex parte Farmers Exch. Bank,783 So.2d 24, 27 (Ala. 2000)). See also State Farm, Fire Cas. Co. v. Owen, 729 So.2d 834 (Ala. 1999).
The relationship between Tyr. and Tys. and the JCDHR arises out of the duty created by the CARA and defined more specifically by the DHR Manual, which, according to Scanlan's affidavit, "was developed and implemented in accordance with the mandates of [Ala. Admin. Code (Department of Human Resources) r.] 660-5-34
and [authorizing] Statutes," including the CARA, and Ala. Code 1975, § 38-2-1 et seq., which created DHR. Section 38-2-6(6) authorizes DHR to "[d]esignate county departments as its agentsunder its rules and regulations to perform any of [DHR's] functions." (Emphasis added.) Section 26-14-12 charges DHR with "establish[ing] such regulations as may benecessary to implement [the CARA]." (Emphasis added.) See also Love v. Davis, 14 F.Supp.2d 1273, 1278
(N.D.Ala.1998) (under the CARA, "[JC]DHR officials have anaffirmative duty to conduct [a thorough] investigation").
Clearly, Tys. and Tyr. are within the class of persons sought to be protected by the CARA, as evidenced by § 26-14-2 and § 38-2-6(10). According to § 26-14-2, the purpose of the CARA is "to protect children whose health and welfare may be adversely affected through abuse and neglect." Section38-2-6(10) charges DHR with the duty to "[s]eek out, through investigation, complaints from citizens, or otherwise, the minor children in the state who are in need of its care and protection," and to "aid such children to a fair opportunity in life." (Emphasis added.) In addition, the DHR Manual (Chapter VII, entitled "Child Protective Services") states, in pertinent part:
 "[Child p]rotective services are provided in response to complaints and reports from all sectors of the community. When children are being harmed or threatened with harm physically or emotionally by the conduct of their caretakers, whether willfully or otherwise, [DHR] has the responsibility to protect these children and provide services to their families so the families can meet their children's safety and developmental needs.
 "When complaints or reports are received, the County [DHR] has the duty and responsibility to evaluate and investigate the complaint or report and:
 "Determine if abuse/neglect occurred and who is responsible for the abuse/neglect of the child(ren);
 "Assess risk factors and determine the level of harm or potential harm to the child(ren);
 "Evaluate the parent's/caretaker's willingness and ability to protect the child(ren);
 "Provide safety interventions/services to control or effectively manage the level of risk; and,
 "If risk cannot be controlled in the home, invoke the legal authority of the court by petition and seek removal of the children from the home and/or secure adequate protection, care, and treatment for the children in the most appropriate manner."
(Emphasis added.)
Moreover, the injuries the plaintiffs allege are of the sort the CARA aims to prevent. Tys. alleges that while she was *Page 529 
spending the night unsupervised, she was trapped in a dwelling that caught fire, resulting in debilitating injuries. In affidavits filed in opposition to the summary-judgment motion, both Tyr. and Tys. alleged that they were frequently left in the residence without adult supervision. In the same affidavits, the sisters alleged that they had been exposed by Tymisha to drugs, physical abuse, and sexual abuse. Significantly, these types of abuse/neglect have specific code numbers in the DHR Manual.
As noted previously in this opinion, Gowens found that the allegations of harm resulting to Tys. from the fire fell within code number N-62, defined in the DHR Manual, in pertinent part, as the "[f]ailure to provide supervision, care, guidance, and/or protection which places the child (a) in a situation beyondhis/her ability to cope, (b) at risk of physical harm, [or] (c) at risk of sexual abuse or other exploitation." (Emphasis added.) He also found that the allegations of harm to both children fell within code number P-23, which, according to the DHR Manual, "means that the parent, caretaker, immediate family member, other person residing in the home or another adult has created a REAL AND SIGNIFICANT DANGER of physical injury or sexual abuse to the child." (Capitalization in original.) The types of injuries alleged as the basis of this action were clearly those types of injuries anticipated by DHR.
Gowens relies on C.B. v. Bobo, 659 So.2d 98
(Ala. 1995), for the proposition that he owed Tys. and Tyr. no duty to conduct a thorough investigation of the September CAN report. However, Bobo is inapposite. The defendants in that case were principals of the Vaughn Road Elementary School in Montgomery ("the school") and the superintendent and members of the Montgomery County Board of Education (hereinafter referred to collectively as "the school administrators"). The plaintiffs were students who had allegedly been sexually abused by a teacher at the school and their parents, who asserted both federal claims and state-law claims, based on the CARA and the common law. 659 So.2d at 100.
As for the parents' purported CARA claims, this Court merely held that there was no private right of action against the school administrators for breach of the mandatory duty toreport imposed by § 26-14-3. 659 So.2d at 102. In doing so, the Court explained:
 "Our review of § 26-14-1 et seq. persuades us that the legislature did not intend to confer a private right of action for any breach of the duty to report imposed by the statute. Rather, our review reveals that the primary thrust of the legislation is to help those who are abused or neglected by establishing child protection services and a method of conducting investigations. While the Act imposes a duty on an individual to make such a report, there is no indication of any legislative intent to impose civil liability for failure to report. Rather, the failure to report is made a misdemeanor and is made punishable by a sentence of not more than six months' imprisonment or a fine of not more than $500. § 26-14-13. Other provisions dealing with such reports provide civil and criminal immunity to those who make a report and they abrogate the rule of privileged communication, with the exception of the attorney-client privilege, as `a ground for excluding any evidence regarding child's injuries or the cause thereof in any judicial proceeding resulting from a report pursuant to this chapter.' § 26-14-10.
 "The [CARA] creates a duty owed to the general public, not to specific individuals, *Page 530 
and, consequently, it does not create a private cause of action in favor of individuals [for breach of duty to report]."
659 So.2d at 102 (emphasis added).
The trial court distinguished this case from Bobo, as do we. The claims in Bobo were brought against statutory reporters for breach of a mandatory duty to report, while Tys. and Tyr.'s claims are against employees of the JCDHR for breach of a duty to investigate. Unlike the breach of duty alleged in Bobo, no criminal liability attaches to the breach alleged in this case. It may logically be concluded that the legislature did not contemplate both
civil and criminal liability against mandatory reporters. Thus, the fact that no criminal penalties are imposed against DHR employees supports the view that the legislature left open the possibility of civil liability for breach of their statutory duties. In other words, it does not follow that, because derelict mandatory reporters are not civilly liable, JCDHR employees may not be held civilly liable.
It is beyond cavil that unless the State DHR and the respective county DHRs properly implement the procedures set forth in the administrative regulations applicable to DHR and in the DHR Manual, the CARA will fail of its essential purpose, namely, "to protect children whose health and welfare may be adversely affected through abuse and neglect." § 26-14-2. In short, we disagree with Gowens that he owed Tys. and Tyr. no duty. We next briefly address the third ground certified for interlocutory review in this case — whether Gowens is entitled to a summary judgment "on the grounds that the plaintiffs have failed to provide substantial evidence of any injury proximately caused by any alleged breach of duty by Gowens."
 C. Proximate Cause
`"[I]t is well established that the question of proximate cause is almost always a question of fact. . . .'"Norris v. City of Montgomery, 821 So.2d 149, 155 n. 8 (Ala. 2001) (quoting Lemond Constr. Co. v. Wheeler,669 So.2d 855, 862 (Ala. 1995)) (emphasis added). However, an interlocutory order should be certified for appeal under Rule 5 only "when that order `involves a controlling question oflaw as to which there is substantial ground for difference of opinion, [and when] an immediate appeal from the order would materially advance the ultimate termination of the litigation and . . . would avoid protracted and expensive litigation.'"Ex parte Liberty Nat'l Life Ins. Co., 825 So.2d 758,762 (Ala. 2002) (emphasis added). In other words, Rule 5 is not a vehicle by which to obtain review of "significant and unresolvedfactual issues." Spain v. Brown WilliamsonTobacco Corp., 872 So.2d 101, 104 (Ala. 2003) (emphasis added).
The third question certified by the trial court does not involve a "controlling question of law." Instead, it addresses the sufficiency of the plaintiffs' evidence regarding proximate cause. We decline, therefore, to review this fact-specific issue.[4] Cf. Ex parte Hudson, 866 So.2d 1115, 1120
(Ala. 2003).
The trial court correctly held that Gowens was not entitled to immunity and properly refused to hold that Gowens owed Tys. and Tyr. no duty. Therefore, the judgment appealed from in case no. 1041341 is affirmed. *Page 531 
 III. Case no. 1041413
The plaintiffs contend that the trial court erred in entering a summary judgment for Rose on the ground of State-agent immunity. Specifically, the trial court stated:
 "Defendant Charity Rose . . . was in a supervisory position. The actions which she took with regard to this case in assigning Defendant Gowens and then following up on the reports that he generated did call upon Defendant Rose to exercise judgment and discretion in ways that [the plaintiffs have] not shown to the court were directed and guided by clear and definite rules, regulations and guidelines. Therefore, the court finds, as a matter of law that state-agent immunity does apply to the allegations made against Defendant Rose and serve as a complete defense to the charges made against her in [the plaintiffs'] complaint."
We agree with the trial court. The complaint alleged that Rose was "responsible for the supervision and monitoring of . . . Gowens and for reviewing findings of suspected neglect or inadequate supervision and for ensuring that appropriate action [be] taken in response to such findings." (Emphasis added.) It also alleged that Rose had a "duty to properly act upon Defendant Gowens's reports of suspected child neglect by Tymisha [S.]."
Rose contends that she is entitled to State-agent immunity, because, she insists, she is being sued for "hersupervision of Gowens's CAN investigation," which, she insists, required her "to exercise her discretion and professional judgment in the performance of discretionary duties specifically enumerated in the Cranman test." Rose's brief, at 26 (emphasis added). There was ample testimony indicating that Rose was operating within the line and scope of her employment by the JCDHR as a "senior social work supervisor." According to its official description, her job "involv[ed] planning, prioritizing, and reviewing [the] work of staff involved in assigned area(s); . . . recommending and participating in the implementation of goals and objectives; implementing policies and procedures of assigned program activities; participating in the selection of staff; and providing or coordinating staff training." The evidence was sufficient to shift the burden to the plaintiffs to show that Rose "acted willfully, maliciously, fraudulently, in bad faith,"Giambrone, 874 So.2d at 1052, or that she "was not exercising [her] . . . judgment in the manner set forth in the examples in Cranman." Ex parte Hudson, 866 So.2d at 1118.
The plaintiffs do not contend that Rose "acted willfully, maliciously, fraudulently, [or] in bad faith." Instead, they insist that "Rose, as the supervisor, is required to . . . review and approve each CAN investigation" within 60 days, and that she did not actually sign the September CAN report within that time period. Plaintiffs' brief, at 21-22. They cite the following provisions of the DHR Manual and instructions for completing certain forms:
 "[1] After assessing the strength and risk in the home, the worker and supervisor will determine the level of risk of harm to the child. The signatures of the worker and supervisor are required on Form DHR-DFC-1924B to document that they have examined the risk factors and concur on the level of risk and the explanation for their determination. If a determination of high risk is made, a safety plan shall be developed to determine immediate action required to protect the child(ren).
 ". . . .
 "[2] If the worker and supervisor determine that the child victim is at risk, actions to protect the child must be implemented *Page 532 
immediately. A safety plan must be developed which addresses the risk factors/combination of risk factors and the interventions to effectively manage these risks. The worker/supervisor in conjunction with the parent/caretaker, the child if age appropriate, and appropriate persons who are involved in case planning activities with the family will devise a plan to protect the child. The safety plan is to be documented on Form DHR-DFC-1924C, High Risk Protocol (Safety Plan). The worker and supervisor are to sign and date the safety plan to indicate their concurrence and approval. Note: The safety plan for low and moderate risk may also be documented on the DHR-DFC-1924C or may be recorded in the case narrative.
 ". . . .
 "[3] In Section V [of Form DHR-DFC-1924C, High Risk Protocol Part C], the worker and supervisor who develop the safety plan must sign and date the form as well as any other participants such as parents or relatives. These signatures show concurrence and approval of the safety plan. It is important to obtain the signature of individuals identified as the `responsible and reliable person' and/or `caretaker' to document their acceptance of responsibility to protect the child."
(Emphasis omitted.) Paragraphs one and two are contained in the DHR Manual, while paragraph three is contained in the "Instructions for Completing the High Risk Protocol Parts A, B, and C." The plaintiffs' reliance on these provisions is unpersuasive.
The plaintiffs' theory of the case is that the JCDHR conducted a negligent investigation of the September CAN report, and their theory against Rose, specifically, is that she acted negligently in supervising Gowens's investigation. On its face, their theory against Rose is "contrary to well-established immunity principles." Vick v. Sawyer, 936 So.2d at 523. See alsoLove v. Davis, 14 F.Supp.2d 1273, 1278 (M.D.Ala.1998) ("[B]ecause supervisory and training functions require constant decision-making, they are, for the most part, discretionary.").
The plaintiffs point to no rule or regulation requiring Rose to conduct an investigation independent of Gowens's investigation. Instead, according to the portions of the DHR Manual on which the plaintiffs rely, Rose's position required her to "assess," "determine," "examine," "concur," and "devise" and "develop" plans. These activities all involve judgment and discretion. By definition, as well as in operation, they are not "checklist" activities, like the one requiring Gowens to verify the number of children in the home by using an outside source. Without an independent duty to investigate, the fact that Rose did not actually sign the September CAN report within 60 days is immaterial.
For these reasons, Rose is entitled to State-agent immunity. The trial court did not err, therefore, in granting her motion for a summary judgment.
 IV. Summary
In summary, the trial court correctly determined that Gowens was not entitled to a summary judgment. Thus, its order in case no. 1041341 denying Gowens's summary-judgment motion is affirmed. Similarly, the trial court correctly entered a summary judgment in favor of Rose in case no. 1041413. The judgment in that case is also affirmed.
1041341 — AFFIRMED.
1041413 — AFFIRMED.
 LYONS, HARWOOD, BOLIN, and PARKER, JJ., concur. *Page 533 
NABERS, C.J., and STUART, J., concur in the result.
SEE, J., recuses himself.
[1] Gowens incorrectly relies on cases from other states construing language in their own peculiar statutory schemes. He has cited us to no statute that mirrors the language found in § 26-14-9. On the contrary, he concedes that some of these "states' statutes explicitly provide immunity to social workers who investigate those reports for the State." Rose's brief, at 46 n. 33 (argument incorporated by reference into Gowens's brief). There is no such language in § 26-14-9, and this Court is not at liberty to rewrite the statute or to substitute its judgment for that of the legislature. Exparte Carlton, 867 So.2d 332, 338 (Ala. 2003).
[2] "This Court recognized in Mitchell v. Davis,598 So.2d 801, 806 (Ala. 1992), that a county department of human resources is considered to be a State agency for purposes of asserting the defense of sovereign immunity." Ex parteFranklin County Dep't of Human Res., 674 So.2d 1277, 1279(Ala. 1996).
[3] The reasons for this rule are self-evident — the perpetrator might have nefarious motives for concealing the existence of other children in the household.
[4] Where the trial court has not identified a controlling question of law, this Court will not address the question certified and accepted for permissive appeal. See BE K, Inc. v. Baker, 875 So.2d 1185, 1189 (Ala. 2003).