SMITH, Justice.
Laci Watson, Erica Jackson, Toni Dollar, and Tracey Eubanks (hereinafter referred to collectively as “the defendants”) petition this Court for a writ of mandamus directing the Jefferson Circuit Court to enter a summary judgment in their favor on the basis of State-agent immunity in a wrongful-death action brought against them by Yolanda Givan, as personal representative of the estate of Dominic Ware. We deny the petition as to Watson and Jackson and grant the petition as to Dollar and Eubanks.

Facts and Procedural History

On July 27, 2005, Dominic was taken to Children’s Hospital in Birmingham after his mother, Sandra Ware, discovered bruising and swelling around Dominic’s eyes and head. Sandra and her boyfriend, Jorge Carter, who were the only ones at home with Dominic immediately before he was taken to the hospital, reported that Dominic may have caught his head under the headboard of Sandra’s bed. A social worker at Children’s Hospital made a report of suspected child abuse to the Jefferson County Department of Human Resources (“DHR”). DHR assigned Watson, a child-abuse-and-neglect (“GA/N”) investigator, to investigate the allegation of child abuse.
Upon arriving at the hospital, Watson saw that one of Dominic’s eyes was swollen, that he had a bruise under the other eye, and that he had bruises on both of his ears. Watson did not find plausible Sandra’s explanation of the cause of Dominic’s injuries. Watson concluded that Dominic had been abused, but she was unable to make a determination as to the identity of the abuser.
On July 28, 2005, Watson conducted a “Placement Decision Individualized Service Plan” (“PDISP”) meeting; Carter and Sandra attended the PDISP meeting. Under that plan, Carter and Sandra were limited to supervised contact with not only Dominic, but also Sandra’s three other children.
On July 29, 2005, a shelter-care hearing was conducted in the Jefferson County Juvenile Court; that court found Dominic to be dependent, ordered custody of him be placed with his maternal great-grandmother, Mattie Ware, and permitted Sandra only supervised visitation. Custody of the other three children, however, remained with Sandra. Additionally, the juvenile court ordered Sandra to submit to a drug screen that day at the Adolescent Substance Abuse Program (“ASAP”); to submit to a psychological evaluation and a substance-abuse assessment; and to comply with the recommendations for treatment as directed by the therapist. DHR was ordered to “closely supervise” the parties’ compliance with the terms of the juvenile court’s order and to prepare a report for the court addressing Dominic’s welfare and the parties’ compliance with the terms of the court’s order and the individualized service plans (“ISPs”). An additional hearing was scheduled for February 7, 2006.
In accordance with the court’s order, Sandra underwent a drug test at the Jefferson County courthouse on July 29, 2005. The test was administered by the University of Alabama at Birmingham’s Treatment Alternative for Safer Communities (“TASC”) program. According to Mere *755 dith Currie, a program manager for the TASC, Watson accompanied Sandra to the drug test. The drug-test results, which were completed a few days later, revealed that Sandra had used cocaine. However, the defendants assert that the results of Sandra’s drug test were not forwarded to any of them, and the defendants did not request the results.[1]
According to Watson, there were no State policies directing how drug-test results were to be received by a county Department of Human Resources office. The defendants assert that there was an “unwritten policy” at DHR that only positive results were forwarded to DHR investigators.[2] However, that evidence is contradicted by evidence indicating that DHR, including Watson and Jackson, would have received all drug-test results, not just the positive ones.
Watson testified that she was authorized to obtain the drug-test results but that it was not her responsibility to do so. Watson stated that her responsibilities involved completing the CA/N investigation and turning over the file to her supervisor, Eubanks. According to Watson, Eubanks in turn would forward the file to Dollar, who supervised Jackson, the “ongoing service worker.”[3]
After the hearing on February 7, 2006, the juvenile court returned Dominic to his mother. The juvenile court was not apprised of the fact that, among other things, Sandra had tested positive for cocaine on July 29, 2005.
On March 11, 2006, Dominic, who was then 16 months old, was again admitted to Children’s Hospital in Birmingham with injuries to his head, back, and extremities, *756 including brain injury caused by blunt-force trauma. Dominic died the following day. His injuries had been inflicted by Carter.[4]
Dominic’s maternal grandmother, Yolanda Givan, as personal representative of Dominie’s estate, filed a complaint alleging a wrongful-death claim against the following persons in their individual capacities: Watson; Watson’s supervisor, Eubanks; Jackson, the ongoing service worker at DHR; and Jackson’s supervisor, Dollar.[5]
Givan’s complaint specifically alleged that
“[the defendants] allowed Dominic Ware to be returned to the custody of his mother, Sandra Ware, in February 2006 without first obtaining the results of Sandra Ware’s court ordered drug test, and by doing so, affirmatively placed Dominic Ware in a position of danger that he would not have otherwise faced.”
In addition to the specific allegation regarding the drug-test results, Givan’s complaint also alleged generally that the defendants “committed acts or omissions which violated specific laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of DHR, proximately causing [Dominic’s] death.” Finally, the complaint alleged that the defendants “acted wilfully, maliciously, fraudulently, in bad faith, beyond [their] authority or under a mistaken interpretation of the law, proximately causing [Dominic’s] death.”
After discovery was conducted, the defendants moved for a summary judgment on the basis that, they asserted, Givan could not “provide any evidence that the defendants failed to follow applicable law or departmental rules, practices or procedures or that they acted outside their authority as employees of the Alabama Department of Human Resources.” Furthermore, the summary-judgment motion asserted that Givan could not provide any evidence that the defendants had “acted wilfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of law.” Finally, the defendants’ summary-judgment motion asserted that
“[t]he most important point of law in this case is that [Givan] has not stated a cause of action in any of the complaints. The State had no legal duty to protect the child at the time of his death because the child was not in the State’s custody, but rather, was in the custody of his mother.”
Givan filed briefs and evidentiary materials in opposition to the defendants’ summary-judgment motion. In addition to her specific allegation that the defendants failed to retrieve and to report the results of Sandra’s drug test, Givan’s materials and evidence opposing the summary-judgment motion alleged a number of specific acts or omissions by the defendants that, Givan argued, defeated the defendants’ assertion of State-agent immunity.
In response, the defendants filed a motion to strike what they said were “new allegations” in the materials filed in opposition to the summary-judgment motion, i.e., the specific allegations other than the allegations that the defendants failed to retrieve and to report the drug-test results. The defendants’ motion to strike *757 argued that the “new allegations” were an untimely attempt to amend Givan’s complaint.
After a hearing, the trial court, without explanation, denied the defendants’ summary-judgment motion and denied their motion to strike. On December 11, 2008, the trial court certified for permissive appeal under Rule 5, Ala. R.App. P., the following controlling question of law: “Whether the defendants are entitled to summary judgment based upon state-agent immunity as to the facts in the case.” This Court ordered that the defendants’ petition for permission to appeal be treated as a petition for a writ of mandamus, limited to the State-agent-immunity issues.

Standard of Review

“This Court has stated:
“ ‘ “While the general rule is that the denial of a motion for summary judgment is not reviewable, the exception is that the denial of a motion grounded on a claim of immunity is reviewable by petition for writ of mandamus. Ex parte Purvis, 689 So.2d 794 (Ala.1996)....
“ ‘ “Summary judgment is appropriate only when ‘there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.’ Rule 56(c)(8), Ala. R. Civ. P., Young v. La Quinta Inns, Inc., 682 So.2d 402 (Ala.1996). A court considering a motion for summary judgment will view the record in the light most favorable to the nonmoving party, Hurst v. Alabama Power Co., 675 So.2d 397 (Ala.1996), Fuqua v. Ingersoll-Rand Co., 591 So.2d 486 (Ala.1991); will accord the nonmoving party all reasonable favorable inferences from the evidence, Fuqua, supra, Aldridge v. Valley Steel Constr., Inc., 608 So.2d 981 (Ala.1992); and will resolve all reasonable doubts against the moving party, Hurst, supra, Ex parte Brislin, 719 So.2d 185 (Ala.1998).
“ ‘ “An appellate court reviewing a ruling on a motion for summary judgment will, de novo, apply these same standards applicable in the trial court. Fuqua, supra, Brislin, supra. Likewise, the appellate court will consider only that factual material available of record to the trial court for its consideration in deciding the motion. Dynasty Corp. v. Alpha Resins Corp., 577 So.2d 1278 (Ala.1991), Boland v. Fort Rucker Nat'l Bank, 599 So.2d 595 (Ala.1992), Rowe v. Isbell, 599 So.2d 35 (Ala.1992).” ’
“Ex parte Turner, 840 So.2d 132, 135 (Ala.2002) (quoting Ex parte Rizk, 791 So.2d 911, 912-13 (Ala.2000)). A writ of mandamus is an extraordinary remedy available only when the petitioner can demonstrate: ‘ “(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court.” ’ Ex parte Nall, 879 So.2d 541, 543 (Ala.2003) (quoting Ex parte BOC Group, Inc., 823 So.2d 1270, 1272 (Ala.2001)).”
Ex parte Yancey, 8 So.3d 299, 303-04 (Ala. 2008).

Discussion

“In Ex parte Cranman, 792 So.2d 392 (Ala.2000), a plurality of this Court restated the test for determining when a State employee is entitled to State-agent immunity:
“‘A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the *758 basis of the claim against the agent is based upon the agent’s
“ ‘(1) formulating plans, policies, or designs; or
“ ‘(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
“ ‘(a) making administrative adjudications;
“ ‘(b) allocating resources;
“ ‘(c) negotiating contracts;
“‘(d) hiring, firing, transferring, assigning, supervising personnel; or
“ ‘(B) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
“ ‘(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers’ arresting or attempting to arrest persons; or
“ ‘(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
“‘Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
“ ‘(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
“ ‘(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.’
“792 So.2d at 405. Although Cranman was a plurality decision, the restatement of law as it pertains to State-agent immunity set forth in Cranman was subsequently adopted by this Court in Ex parte Rizk, 791 So.2d 911 (Ala.2000), and Ex parte Butts, 775 So.2d 173 (Ala.2000).
“Additionally, this Court has stated:
“ ‘This Court has established a “burden-shifting” process when a party raises the defense of State-agent immunity. Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala.2003). In order to claim State-agent immunity, a State agent bears the burden of demonstrating that the plaintiffs claims arise from a function that would entitle the State agent to immunity. Giambrone, 874 So.2d at 1052; Ex parte Wood, 852 So.2d 705, 709 (Ala.2002). If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority. Giambrone, 874 So.2d at 1052; Wood, 852 So.2d at 709; Ex parte Davis, 721 So.2d 685, 689 (Ala.1998). “A State agent acts beyond authority and is therefore not immune when he or she ‘fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.’” Giambrone, 874 So.2d at 1052 (quoting Ex parte Butts, 775 So.2d 173, 178 (Ala.2000)).’
“Ex parte Estate of Reynolds, 946 So.2d 450, 452 (Ala.2006).”
Ex parte Yancey, 8 So.3d at 304-05.
Givan does not dispute that the defendants are State agente or that the defendants made a sufficient showing in their summary-judgment motion to shift the *759 burden to her to demonstrate that the defendants are not entitled to State-agent immunity. She contends, however, that she offered, in opposition to the defendants’ summary-judgment motion grounded on State-agent immunity, substantial evidence indicating that the “defendants acted beyond their authority in twenty-five different ways.” (Givan’s brief, p. 1.) She asserts:
“[I]f the defendants had complied with the mandatory State [Department of Human Resources] regulations, policies, and court orders that governed their conduct[,] ... [the juvenile court judge] would have known (among other things): (1) that Carter had a criminal background that included burglary, theft, drug trafficking, and gang violence; (2) that Carter lived in the home with Sandra before, during, and after the July 27, 2005, beating; (3) that Carter was the chief disciplinarian of Dominic and Sandra’s other children; (4) that Carter called Sandra his wife and Dominic his son; and (5) that Carter and Sandra consumed cocaine and other drugs on a daily basis before, during, and after the July 27, 2005, beating. Because [the juvenile court judge] was not apprised of these facts, [the judge] unwittingly returned Dominic back to Sandra’s care [in February 2006]. Approximately one month later, Sandra foreseeably left Dominic in Carter’s care, and Carter fore-seeably beat him to death.”
(Givan’s brief, pp. 1-2.)

I.

We first address the defendants’ argument regarding the trial court’s denial of their motion to strike what the defendants contend were new “claims” presented by Givan in her materials in opposition to their summary-judgment motion. We consider the defendants’ argument regarding the trial court’s denial of their motion to strike because it is intertwined with their argument regarding the denial of their motion for a summary judgment grounded on State-agent immunity.
The defendants implicitly recognize that Givan’s complaint includes a general allegation that the defendants “committed acts or omissions which violated specific laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of DHR, proximately causing [Dominic’s] death.” Even so, the defendants argue:
“[Givan’s] complaint clearly sets out a specific act or omission as to each Defendant regarding the drug-test retrieval issue. Like fraud cases or medical-malpractice suits, a plaintiff should have to plead some specificity as to each act or omission. It is the alleged act or omission in a State-immunity case that puts the State-agent on notice of the actual claim. For instance in a medical-malpractice case, a detailed specification and factual description of each act or omission must be alleged by the plaintiff to render the health care provider liable. Long v. Wade, 980 So.2d 378, 386 (Ala.2007). Otherwise, as in this case, on the eve of trial a defendant asserting State-agent immunity will not know what all the claims are.... ”
(Defendants’ reply brief, pp. 19-20.)
Thus, the defendants argue (1) that a plaintiff must plead with specificity the claims in her complaint in order to defeat a defendant’s possible claim of State-agent immunity or (2) that, after a defendant has moved for a summary judgment on the basis of State-agent immunity, a plaintiff must amend her complaint to add specific allegations in addition to her general allegation.
As noted, the defendants cite, in support of their position, the heightened-pleading *760 requirements that apply to a plaintiff alleging fraud or medical malpractice. Those requirements, however, are imposed either by a rule of this Court or by statute. See Rule 9(b), Ala. R. Civ. P. (fraud);[6] § 6-5-551, Ala.Code 1975 (medical malpractice).[7] In the absence of any similar authority in the context of a claim against a State agent, the defendants in their mandamus petition have not demonstrated “a clear legal right” to a holding that Givan’s general allegation in her complaint was insufficient or that a heightened-pleading requirement should apply to Givan in this case. See Ex parte Yancey, 8 So.3d at 304.

II.

Givan argues that Watson, the CA/N investigator, acted beyond her authority and is therefore not entitled to State-agent immunity. Specifically, Givan contends, among other things, that Watson failed to comply with Ala. Admin. Code (Department of Human Resources) Regulation 660-5-34-.05(l)(b).[8] Regulation 660-5-34.05(1) provides “standards for conducting CA/N assessments on child abuse/neglect reports” that “must be followed.” Subsection (b) states:
“(b) Assessing Reports with Parents. Contact must be initiated with a custodial parent promptly upon receipt of a report except in instances where such action could pose danger for the child involved. The contact should establish the need for protective services or agency non-intervention. A home visit is required and may be made with or without prior notification.”
Givan contends that Watson violated subsection (b) because, she says, Watson did not conduct a home visit of Sandra and Carter’s home before Dominic was released to Sandra’s custody.[9] Watson does *761 not dispute that she never conducted a home visit of Sandra and Carter’s home.[10]
The defendants argue that Watson submitted substantial evidence indicating that she visited Givan’s house and Mattie Ware’s house. However, the defendants do not specifically contend that either Gi-van or Mattie qualified as a “custodial parent” under Regulation 660-5-34-,05(l)(b). Consequently, because Givan offered substantial evidence indicating that Watson violated Regulation 660-5-34-.05(l)(b) and because Watson has not submitted substantial evidence indicating that she complied with subsection (b), Watson has not demonstrated that she is entitled to State-agent immunity.
As set forth above, the defendants sought a summary judgment on all claims asserted against them by Givan, asserting in their summary-judgment motion that Givan could not “provide any evidence that the defendants failed to follow applicable law or departmental rules, practices or procedures or that they acted outside their authority as employees of the Alabama Department of Human Resources” or any evidence that the defendants “acted wilfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of law.” The defendants have not, however, demonstrated in their materials to this Court that they are entitled to a summary judgment as to all the claims against Watson. Accordingly, the defendants’ petition as to Watson is due to be denied.

III.

Among other things, Givan contends that Jackson, the ongoing service worker, faded to comply with what Givan characterizes as a “mandatory checklist” given to Jackson in a memorandum from her supervisor, Dollar. Specifically, Givan contends that Jackson failed to comply with the instructions in the memorandum to “[g]ather more information on ... Jorge Carter (background check, employment, residence, etc.)” and to “[g]et records from Children’s Hospital concerning [Dominic’s] injuries.” Jackson does not dispute that she failed to comply with Dollar’s instructions in the memorandum. Instead, she testified that she did not gather any information on Carter because she did not believe that Carter was living with Sandra based upon what the family and Sandra had told her.[11] The defendants *762 assert that Jackson “may have been naive, but this only at best would amount to negligence.” The defendants further assert that the memorandum “is not DHR policy and should not defeat immunity.”
Notably, however, Jackson does not argue that she had the discretion to disregard Dollar’s instructions in the memorandum; for all that appears in the materials before us, the memorandum from Dollar to Jackson was binding on Jackson and removed any discretion Jackson might have had in deciding whether to perform the specific tasks Dollar listed in the memorandum. There is no dispute that Dollar had the authority to impose mandatory duties upon Jackson in the form of a memorandum like the one relied upon by Givan, and the memorandum from Dollar to Jackson was sufficiently clear in its instructions and was binding on Jackson. In this regard, the memorandum from Dollar to Jackson is analogous to the instructions in Giambrone v. Douglas, 874 So.2d 1046 (Ala.2003), in which a high-school wrestling coach’s claim of State-agent immunity was denied because the coach had not complied with the instructions of his supervisor, the athletics director, to, among other things, follow the guidelines of the Alabama High School Athletic Association. 874 So.2d at 1053-55. Thus, Jackson’s failure to comply with the above-stated mandatory requirements in the “checklist” in Dollar’s memorandum defeats her claim of State-agent immunity. As noted above, “ ‘ “[a] State agent acts beyond authority and is therefore not immune when he or she ‘fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.’ ” ’ ” Ex parte Yancey, 8 So.3d at 305 (quoting Ex parte Estate of Reynolds, 946 So.2d at 452, quoting in turn Giambrone, 874 So.2d at 1052, which quoted Ex parte Butts, 775 So.2d 173, 178 (Ala.2000) (emphasis added)).
The defendants sought a summary judgment on all claims against them. However, in their materials to this Court, the defendants have not shown that they are entitled to a summary judgment as to all the claims asserted against Jackson. Accordingly, the defendants’ petition as to Jackson is due to be denied.

IV.

Givan contends that both Eubanks and Dollar “acted beyond [their] authority in four ways.” As to Eubanks, Givan contends (1) that she “failed to review, sign, and approve the July 28, 2005, initial [PD]ISP”; (2) that “she failed to ensure that the initial assessment be completed in ninety days (i.e., before October 26, 2005)”; (3) that she failed to “review all initial assessments to determine that child welfare staff have complied with the general requirements and information collection protocol [and] any deviations have received supervisory concurrence and been adequately documented”; and (4) that “she allowed Watson to give the disposition of ‘indicated’ when she should have given ‘unable to complete.’ “ As to Dollar, Givan contends (1) that “she failed to ensure that the initial review of the [PDISP] occurred within thirty days”; (2) that “she failed to ensure that an ISP review occurred within six months”; (3) that “she failed to take any action to address or revisit the rule that Carter only have supervised visitation of the children”; and (4) that “she failed to sign Jackson’s deficient court report.”
In support of the summary-judgment motion, Eubanks submitted an affidavit setting forth the following:
“As a Service Supervisor for the Jefferson County Department of Human Resources, I performed all of my duties within the line and scope of my employment. I supervised the child abuse and neglect investigative worker, Laci Wat *763 son, who was assigned to investigate allegations of physical, abuse concerning Dominic Ware. My duties as a Service Supervisor included the following:
“1. Supervises and monitors the Child Protective Services Investigation Program so that investigations are initiated, conducted, and completed [in] accordance to policy.
“2. Correctly compiles and timely submits [State Department of Human Resources] and locally required monthly, quarterly, and annual program reports so that few errors are noted.
[[Image here]]
“4. Plans, organizes, assigns, monitors, evaluates and coordinates unit work including corrective action plans, as needed, so that required work is complete.
“5. Supervises, supports, instructs employees through training, consultation, evaluation and leadership so that staff is proficient in job tasks.
[[Image here]]
“7. Supervises/Evaluates the performance of staff in order to determine the level of work performance, identify training needs, and compliance.
[[Image here]]
“9. Maintains supervisee’s files which include at a minimum copies of preappraisals, responsibilities statements, form 40, notes from conferences. ...
“10. Facilitate and attend ISP’s/placement decision ISP’s when necessary....”
Dollar submitted a substantially similar affidavit setting forth her supervisory responsibilities and asserting that she “performed all of [her] duties within the line and scope of [her] employment,” including the supervision of Jackson.
In Gowens v. Tys. S., 948 So.2d 513 (Ala.2006), this Court addressed similar claims brought against a supervisor (Charity Rose) at the Jefferson County Department of Human Resources. Regarding those claims, the Gowens Court stated:
“The plaintiffs contend that the trial court erred in entering a summary judgment for Rose on the ground of State-agent immunity. Specifically, the trial court stated:
“ ‘Defendant Charity Rose ... was in a supervisory position. The actions which she took with regard to this case in assigning Defendant Gowens and then following up on the reports that he generated did call upon Defendant Rose to exercise judgment and discretion in ways that [the plaintiffs have] not shown to the court were directed and guided by clear and definite rules, regulations and guidelines. Therefore, the court finds, as a matter of law that state-agent immunity does apply to the allegations made against Defendant Rose and serve as a complete defense to the charges made against her in [the plaintiffs’] complaint.’
“We agree with the trial court. The complaint alleged that Rose was ‘responsible for the supervision and monitoring of ... Gowens and for reviewing findings of suspected neglect or inadequate supervision and for ensuring that appropriate action [be] taken in response to such findings.’ (Emphasis added.) It also alleged that Rose had a ‘duty to properly act upon Defendant Gowens’s reports of suspected child neglect by Tymisha [S.].’
“Rose contends that she is entitled to State-agent immunity, because, she insists, she is being sued for ‘her supervision of Gowens’s CAN investigation,’ which, she insists, required her ‘to exer- *764 rise her discretion and professional judgment in the performance of discretionary duties specifically enumerated in the Cranman test.’ Rose’s brief, at 26 (emphasis added). There was ample testimony indicating that Rose was operating within the line and scope of her employment by the [Jefferson County] DHR as a ‘senior social work supervisor.’ According to its official description, her job ‘involv[ed] planning, prioritizing, and reviewing [the] work of staff involved in assigned area(s); ... recommending and participating in the implementation of goals and objectives; implementing policies and procedures of assigned program activities; participating in the selection of staff; and providing or coordinating staff training.’ The evidence was sufficient to shift the burden to the plaintiffs to show that Rose ‘acted willfully, maliciously, fraudulently, in bad faith,’ Giambrone [v. Douglas], 874 So.2d [1046,] at 1052 [(Ala.2003)], or that she ‘was not exercising [her] ... judgment in the manner set forth in the examples in Cranman.’ Ex parte Hudson, 866 So.2d [1115,] at 1118 [(Ala.2003)].
“The plaintiffs do not contend that Rose ‘acted willfully, maliciously, fraudulently, [or] in bad faith.’ Instead, they insist that ‘Rose, as the supervisor, is required to ... review and approve each CAN investigation’ within 60 days, and that she did not actually sign the September CAN report within that time period. Plaintiffs’ brief, at 21-22. They cite the following provisions of the [Department of Human Resources] Manual and instructions for completing certain forms:
“ ‘[1] After assessing the strength and risk in the home, the worker and supervisor will determine the level of risk of harm to the child. The signatures of the worker and supervisor are required on Form DHR-DFC-1924B to document that they have examined the risk factors and concur on the level of risk and the explanation for their determination. If a determination of high risk is made, a safety plan shall be developed to determine immediate action required to protect the child(ren).
[[Image here]]
“ ‘[2] If the worker and supervisor determine that the child victim is at risk, actions to protect the child must be implemented immediately. A safety plan must be developed which addresses the risk factor s/combination of risk factors and the interventions to effectively manage these risks. The worker/supervisor in conjunction with the parent/caretaker, the child if age appropriate, and appropriate persons who are involved in case planning activities with the family will devise a plan to protect the child. The safety plan is to be documented on Form DHR-DFC-1924C, High Risk Protocol (Safety Plan). The worker and supervisor are to sign and date the safety plan to indicate their concurrence and approval. Note: The safety plan for low and moderate risk may also be documented on the DHR-DFC-1924C or may be recorded in the case narrative.
[[Image here]]
“ ‘[3] In Section V [of Form DHR-DFC-1924C, High Risk Protocol Part C], the worker and supervisor who develop the safety plan must sign and date the form as well as any other participants such as parents or relatives. These signatures show concurrence and approval of the safety plan. It is important to obtain the signature of individuals identified as the “responsible and reliable person” and/or *765 “caretaker” to document their acceptance of responsibility to protect the child.’
“(Emphasis omitted.) Paragraphs one and two are contained in the [Department of Human Resources] Manual, while paragraph three is contained in the ‘Instructions for Completing the High Risk Protocol Parts A, B, and C.’ The plaintiffs’ reliance on these provisions is unpersuasive.
“The plaintiffs’ theory of the case is that the [Jefferson County] DHR conducted a negligent investigation of the September CAN report, and their theory against Rose, specifically, is' that she acted negligently in supervising Gow-ens’s investigation. On its face, their theory against Rose is ‘contrary to well-established immunity principles.’ Vick v. Sawyer, 936 So.2d [517,] at 523 [(Ala.2006)]. See also Love v. Davis, 14 F.Supp.2d 1273, 1278 (M.D.Ala.1998) (‘[B]eeause supervisory and training functions require constant decision-making, they are, for the most part, discretionary.’).
“The plaintiffs point to no rule or regulation requiring Rose to conduct an investigation independent of Gowens’s investigation. Instead, according to the portions of the [Department of Human Resources] Manual on which the plaintiffs rely, Rose’s position required her to ‘assess,’ ‘determine,’ ‘examine,’ ‘concur,’ and ‘devise’ and ‘develop’ plans. These activities all involve judgment and discretion. By definition, as well as in operation, they are not ‘checklist’ activities, like the one requiring Gowens to verify the number of children in the home by using an outside source. Without an independent duty to investigate, the fact that Rose did not actually sign the September CAN report within 60 days is immaterial.”
948 So.2d at 531-32.
The defendants in the present case point out that, like the claims against the supervisor in Gowens, all Givan’s allegations against Eubanks and Dollar are addressed solely to supervision — i.e., Eubanks’s review of the CA/N and Watson’s work, and Dollar’s review of Jackson’s work. Givan does not refer to any rule or regulation requiring Eubanks or Dollar to act independently of the workers they were supervising. Consequently, Eubanks and Dollar have shown that they are entitled to State-agent immunity for Givan’s claims against them.

Conclusion

The petition is denied as to Watson’s and Jackson’s claims of State-agent immunity; the petition is granted as to Dollar’s and Eubanks’s claims of State-agent immunity.
PETITION GRANTED IN PART AND DENIED IN PART; WRIT ISSUED.
COBB, C.J., and LYONS, WOODALL, STUART, BOLIN, PARKER, and SHAW, JJ., concur.
MURDOCK, J., concurs in part and dissents in part.

. According to her affidavit, Anita Turner, the substance-abuse-counselor liaison for the Jefferson-Blount-St. Clair Mental Health/Mental Retardation Authority, picked up drug-test results for Jefferson County as a part of her duties. Turner testified she would pick up the results and forward only positive results to the worker or supervisor who requested drug testing. Notably, the documentation from the drug-test results received on July 29, 2005, show results for a "Sharon Ware” but no results for a “Sandra Ware.” Turner asserted that she was not provided any drug-test results for Sandra Ware on July 29, 2005. Cur-rie confirmed in her deposition testimony that the documentation for the drug-test results received on July 29, 2005, identified "Sharon Ware” but not "Sandra Ware.” Currie further testified that she was not aware of any written policy at DHR regarding drug-test results and that she did not know any of the protocols DHR had with Turner as the liaison. Currie testified, however, that the policy of TASC was to forward all results, both positive and negative, to DHR.

. Included in the materials submitted to this Court are affidavits from DHR employees Clarence Rowe, Eubanks, Turner, Dollar, Watson, and Jackson that include the following (or substantially similar) language:
"The practice in the West Region of Jefferson County Department of Human Resources was that if you did not receive the results, the results were presumed to be negative. There is no Alabama Department of Human Resources policy that directs how drug tests results are to be received by a county office like Jefferson County Department of Human Resources.”

.Watson testified:
"Q. [By Givan's attorney:] And what does that mean when you prepare the case to be transferred to the ongoing worker?
"A. It just means that I made sure that the order was in the file, the other paperwork was in there, copies of the ... [transfer narrative, the court order, ... the pickup orders, ... any home evaluations that were done and ... the PDISP and ... if the children were placed in protective custody there’s also some other forms and I don't recall the names of the forms.
[[Image here]]
"Q. And then this is provided to the ongoing worker?
"A. I provide it to my supervisor [Eu-banks] .... [Then] [s]he sends it to the ongoing supervisor [Dollar].”

. Carter ultimately was convicted of capital murder for killing Dominic; he was sentenced to life in prison without the possibility of parole. See § 13A-5-40(a)(15), Ala.Code 1975.

. Givan's complaint also named as defendants Angela Tandeer, the Child Welfare Director for DHR, and Dollar's supervisor, Clarence Rowe; however, the claims against them were ultimately dismissed.

. Rule 9(b), Ala. R. Civ. P., states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.”

. Section 6-5-551, Ala.Code 1975, provides:
"In any action for injury, damages, or wrongful death ... against a health care provider for breach of the standard of care ... the Alabama Medical Liability Act shall govern the parameters of discovery and all aspects of the action. The plaintiff shall include in the complaint filed in the action a detailed specification and factual description of each act and omission alleged by plaintiff to render the health care provider liable to plaintiff and shall include when feasible and ascertainable the date, time, and place of the act or acts. The plaintiff shall amend his complaint timely upon ascertainment of new or different acts or omissions upon which his claim is based; provided, however, that any such amendment must be made at least 90 days before trial. Any complaint which fails to include such detailed specification and factual description of each act and omission shall be subject to dismissal for failure to state a claim upon which relief may be granted. Any party shall be prohibited from conducting discovery with regard to any other act or omission or from introducing at trial evidence of any other act or omission.”

. Givan also alleges that Watson violated Ala. Admin. Code (Department of Human Resources) Regulation 660-5-50-.07, which requires periodic home visits. However, that section, which applies to foster-care situations, did not apply in the present case.

. Watson did not make a home visit, but the ongoing service worker, Jackson, testified that she made unannounced home visits as a part of her work. However, Sandra testified that Jackson’s visits were not unannounced; Sandra asserted that Jackson always telephoned before she made a home visit, and Sandra stated that she would tell Carter to leave before Jackson arrived.
Jackson testified that she did not focus on Carter because Carter was not listed in the CA/N materials as a potential perpetrator. Jackson testified:
“Q. [By Givan's attorney:] Is there any documentation anywhere in your narrative *761 from the time that this file was opened with you in August [2005] until April 2006 of any conversation that you had with any of the three other children concerning Jorge Carter?
"A. If there was it was after the child's death. Even though he was questioned he was not focused on.... It was clear that he was not in the home and that was the part of policy to know who lives in the home.
"Q. So you're saying that between the time that you opened this file ... in August [2005] and up until the time of the child’s death in March [2006] that you had no idea that Jorge Carter was in the home, is that your testimony?
“A. My testimony is that it was reported to me that he did not live in [Sandra’s] home from more than one source.”
Jackson admitted that she had received a copy of a psychological evaluation of Sandra indicating that Carter was living in the home with Sandra and her four children, but she testified that by the time she received the report Carter was in jail.

. Sandra testified that she ”remember[ed] [Watson's] coming up to the house and talking with me and [Carter].” However, Watson unequivocally testified that she did not go to Sandra's house at any point during her investigation. Watson testified as follows:
"Q. [By Givan’s attorney:] At any point, did you ever go to the home of Sandra Ware during the course of your investigation?
“A. No.”

. See supra note 9.