BOLIN, Justice.
The Town of Dauphin Island ("the Town") petitions this Court for a writ of mandamus directing the Mobile Circuit Court to set aside its order denying the Town's motion for a summary judgment based on the recreational-use statutes, in § 35-5-1 et seq., Ala. Code 1975, and to enter a summary judgment in its favor on the claims brought by Bobbi Rogers, individually, and in her capacity as next friend of her minor daughter, Rebecca Hatem (hereinafter collectively referred to as "the plaintiffs"). We grant the petition and issue the writ.
Facts and Procedural History
W & S Green, LLC, owns the property known as Green Park located in the Town. William L. Green III and his wife, Sally L. Green, are the only two members of W &
*239 S Green. The Greens reside in Florida. In 2008, the Town entered into a three-year "Land Use Lease Agreement" with W & S Green to lease the property known as Green Park to the Town. Pursuant to the terms of the lease, W & S Green granted the Town the exclusive right to use the property as a public-pedestrian park in exchange for compensation of $1.00 annually. The Town has maintained Green Park as a free public park and does not charge the public an admission fee for use of the park. Neither the Greens nor W & S Green have managed the property known as Green Park since it was leased to the Town in 2008. In 2011, the Town and W & S Green extended the term of the lease for an additional three years.
The Town is responsible for the maintenance and upkeep of the property under the terms of the lease. Corey Moore serves as the public-works superintendent and has seven employees under his direction. The Town maintains the park by trimming and removing small limbs and debris. However, because of its small size and limited resources, the Town does not have the capability to remove large limbs or trees. The Town contracts with outside tree services for the removal of large limbs and trees when necessary.
In 2006, a resident of the Town constructed a swing and donated it to the Town in memory of his deceased grandson. At some point the Town's public-works department hung the swing from the large tree that served as the centerpiece of Green Park. The chain from which the swing was hung was coated with thick plastic. In November 2013, Bill Phillips, a friend of the Greens and a resident of the Town, informed William Green that the swing had been hung from the tree. William was previously unaware that the swing had been hung in the tree and asked Phillips to contact Jeff Collier, the Town's mayor, to find out why the swing had been hung. William testified as follows about his concern regarding the swing:
"I didn't want anything to happen to [the tree], cosmetically. That tree is a centerpiece of the property and makes the property more valuable. So anything that might cosmetically hurt that tree, I didn't want to happen."
William stated that he never visited the park and never saw the swing, the tree, or the limb the swing was attached to, nor did he have any knowledge of the condition of the tree or swing. He stated that there "wasn't any immediate concern on [his] part. [He] just wanted to know what was going on and why the swing was there."
Collier testified that Phillips contacted him and informed him of William's concerns that the swing might potentially damage the tree limb from which it was suspended. Collier assumed that Phillips was referring to potential scraping or chafing of the bark on the limb by the chain that the swing was suspended from. Collier specifically stated that at no time during his conversation with Phillips did they discuss the safety of the swing and the tree in terms of the swing causing the limb from which it was suspended to break. In response to his conversation with Phillips, Collier testified that he asked Moore to go "check out" the swing and do "whatever he felt was necessary."
Moore testified that he went to the park to inspect the swing on the day after Collier had informed him of William's concerns. Moore stated that he saw the swing suspended from a limb by a chain and that the chain had a "hose over it." Moore testified that the tree limb "did not look damaged at all" to him. Moore testified that, because William had concerns that the swing might injure the tree, he instructed his crew to take the swing down *240 when they got a "chance." It is undisputed that the swing was not taken down.
On November 21, 2013, just several days after Phillips had spoken to Collier about the swing, Rebecca Hatem and her friend, Destiny Henry, entered the park and sat in the swing. Hatem testified that she and her friend had been sitting in the swing for approximately 10 minutes when they heard a "creaking" sound and looked up to see the tree limb falling. The limb landed on Hatem's leg, causing her to suffer a compound fracture and pinning her under the limb.
Charlotte Hall, a family friend of the plaintiffs', was scheduled to pick Hatem up from the park on the day in question and to give her a ride home. Hall testified that she received a telephone call from Bobbi Rogers, Hatem's mother, informing her that Hatem had suffered a broken leg at the park.[1] Hall testified that she proceeded straight to the park and that when she reached Hatem she was being attended to by emergency personnel. Hall testified that Hatem was crying and that she attempted to calm her down. Hall called Rogers to report Hatem's condition and then gave her cellular telephone to Hatem so that she could talk to Rogers.
Hall testified that while she was present at the scene she overheard a conversation between unidentified individuals discussing the trees in the park. Hall stated that she did not know whether those individuals were employees of the Town. Hall testified as follows:
"Q. Did you have any conversation with anyone there about the tree or the state of the trees in Green Park?
"A. As far as talking about the trees, I heard some people talking, and I think they were from -- I don't know if they were from the Town of Dauphin Island or from the beach board. Said something about the trees needing to be trimmed or something done to the trees. They said that they were -- they were going to be done or that they had talked about it at a meeting or something. I just overheard conversations.
"....
"Q. Okay. And do you know who that person or who those persons were?
"A. There was a lady that had dark hair. That's the only one I remember. And I think she was talking to a man.
"....
"Q. Okay. Did you hear anyone else make any comment other than what you just said about the trees or trimming or anything like that?
"A. No, I didn't.
"....
"Q. Do you recall anything about that conversation like what --
"....
"A. Something about a meeting that they had had or something and that they had discussed trees needing to be trimmed or something to that effect."
Hall testified that she did not remember handing her cell phone to anyone at the scene to talk to Rogers other than Hatem. Hall also stated that she did not remember hearing anyone else at the scene, other than Hatem, talking to Rogers on a cell phone.
Rogers has a different recollection. She states that she spoke with "someone from the City" on Hall's cell phone regarding the trees in the park. Rogers testified as follows:
*241 "Q. Before you left the place where you were working, did you have any other conversations with anyone?
"A. Yes. [Hall] called me and was giving me updates on ambulances and what was going on. And someone from the City took the phone from her, told her that they knew there was a problem with the trees and they were -- didn't have time to get to it to take care of the situation and they was going to take care of it.
"....
"Q. And it's your recollection that at some point Charlotte Hall gave her phone to someone with the City who said that there was a problem with some trees and they were going to take care of it?
"A. Yes.
"Q. And are those the words that you remember them saying?
"A. Yes.
"Q. Did you have a conversation with anyone else from the City besides that person?
"A. Not that I'm aware of.
"Q. Do you remember that person's name or did she give it at that time or was it a man or --
"A. It was a female.
"....
"Q. I take it then that person didn't say why they were going to do something about the trees?
"A. She just told me that the -- there was a problem with the swings and the trees and they needed to come down. They just haven't had time to get to it.
"....
"Q. Tell me specifically what was said about what needed to come down. Do you remember whether it was any specifics or just --
"A. She knew there was a problem with the trees and the swings. They needed to come down. They haven't got to them to take them down."
On May 7, 2014, the plaintiffs sued the Town alleging negligence and seeking to recover damages for the injuries Hatem suffered. On May 15, 2014, the plaintiffs amended their complaint to assert a violation of § 35-15-24, Ala. Code 1975, alleging that the Town was aware of the dangerous condition presented by the tree limb and swing and that the Town failed to "remove, guard, or warn against" it. Rogers also asserted a claim based on a loss of services. On July 31, 2014, the plaintiffs filed a second amended complaint to add W & S Green as a party defendant.
On June 27, 2017, W & S Green moved for a summary judgment. On August 21, 2017, the trial court entered a summary judgment in favor of W & S Green. On November 3, 2017, the Town moved for a summary judgment, arguing that it was immune from suit pursuant to the recreational-use statutes found in § 35-15-1 et seq., Ala. Code 1975. Specifically, the Town argued that it was entitled to the protections offered by those statutes because Green Park was part of its park system and was open to the public at no charge. The Town further argued that the plaintiffs failed to present substantial evidence indicating that the Town had actual knowledge that the tree and swing presented "an unreasonable risk of death or serious bodily harm." § 35-15-24(a)(2), Ala. Code 1975.
The plaintiffs argued in opposition to the Town's summary-judgment motion that the Town created a hidden danger by negligently hanging the swing from the tree limb and that it was, therefore, required to give notice, or warning, or to exercise reasonable care to provide safeguards against *242 the hidden danger. The plaintiffs further argued that once the Town was made aware of the dangerous condition presented by the swing it took no corrective measure, such as removing the swing, to avoid negligently injuring Hatem. As for § 35-15-24, the plaintiffs argued that the Town did have actual knowledge that the swing presented an unreasonable risk of serious bodily harm and that, with such knowledge, it chose not to warn or guard against the condition presented by the swing.
On January 2, 2018, the trial court denied the Town's summary-judgment motion grounded in immunity, finding that the statute relied upon by the Town "does not apply to this fact situation" and that the Town "created this hazard, which further takes it out of the purview of the statute." This petition followed.
Standard of Review
"While the general rule is that the denial of a motion for summary judgment is not reviewable, the exception is that the denial of a motion for summary judgment grounded on a claim of immunity is reviewable by petition for writ of mandamus." Ex parte Rizk, 791 So.2d 911, 912 (Ala. 2000). This Court has stated that the recreational-use statutes provide immunity to qualifying landowners. See Ex parte City of Guntersville, 238 So.3d 1243, 1246 (Ala. 2017). Thus, the denial of a motion for a summary judgment grounded on the immunity found in the recreational-use statutes is reviewable by a petition for a writ of mandamus.
This Court has stated the applicable standard relevant to a petition for a writ of mandamus challenging the denial of a motion for a summary judgment as follows:
" ' "Summary judgment is appropriate only when 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.' Rule 56(c)(3), Ala. R. Civ. P., Young v. La Quinta Inns, Inc., 682 So.2d 402 (Ala. 1996). A court considering a motion for summary judgment will view the record in the light most favorable to the nonmoving party, Hurst v. Alabama Power Co., 675 So.2d 397 (Ala. 1996), Fuqua v. Ingersoll-Rand Co., 591 So.2d 486 (Ala. 1991) ; will accord the nonmoving party all reasonable favorable inferences from the evidence, Fuqua, supra, Aldridge v. Valley Steel Constr., Inc., 603 So.2d 981 (Ala. 1992) ; and will resolve all reasonable doubts against the moving party, Hurst, supra, Ex parte Brislin, 719 So.2d 185 (Ala. 1998).
" ' "An appellate court reviewing a ruling on a motion for summary judgment will, de novo, apply these same standards applicable in the trial court. Fuqua, supra, Brislin, supra. Likewise, the appellate court will consider only that factual material available of record to the trial court for its consideration in deciding the motion. Dynasty Corp. v. Alpha Resins Corp., 577 So.2d 1278 (Ala. 1991), Boland v. Fort Rucker Nat'l Bank, 599 So.2d 595 (Ala. 1992), Rowe v. Isbell, 599 So.2d 35 (Ala. 1992)." '
" Ex parte Turner, 840 So.2d 132, 135 (Ala. 2002) (quoting Ex parte Rizk, 791 So.2d 911, 912-13 (Ala. 2000) ). A writ of mandamus is an extraordinary remedy available only when the petitioner can demonstrate: ' "(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court." ' Ex parte Nall, 879 So.2d 541, 543 (Ala. 2003) (quoting Ex parte BOC Group, Inc., 823 So.2d 1270, 1272 (Ala. 2001) )."
*243 Ex parte Yancey, 8 So.3d 299, 303-04 (Ala. 2008).
Discussion
1. Applicability of Article 2 of the Recreational-Use Statutes
The Town argues that it is entitled to the immunity found in the recreational-use statutes because, it says, the plaintiffs have failed to present substantial evidence indicating that it had actual knowledge that the swing that allegedly caused Hatem's injuries presented an unreasonable risk of death or serious bodily injury. See § 35-15-24(a)(2). This Court has stated the following regarding the recreational-use statutes:[2]
"In Ex parte City of Geneva, 707 So.2d 626 (Ala. 1997), this Court set forth the following applicable law concerning the recreational-use statutes:
" 'Sections 35-15-1 through -5[, Ala. Code 1975,] of the recreational use statutes, appearing in Article 1 of Chapter 15, define and limit the duties of an owner of recreational land in relation to a person using the land for recreational purposes. Under these sections, "[a]n owner, whether public or private, owes no duty to users of the premises except for injury caused by a willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity." Poole v. City of Gadsden, 541 So.2d 510 (Ala. 1989) ; § 35-15-3, Ala. Code 1975.
" 'Unlike Article 1, Article 2, consisting of §§ 35-15-20 through -28, [Ala. Code 1975,] applies specifically to owners of noncommercial public recreational land, such as the City here. These sections "provide such landowners with even greater protections than §§ 35-15-1 through -5." Poole, at 513. See also Grice v. City of Dothan, 670 F.Supp. 318, 321 (M.D. Ala. 1987) ("[Article 2] further limits the liability of owners of land"); Clark v. Tennessee Valley Authority, 606 F.Supp. 130 (N.D. Ala. 1985) ("[Article 2] provides [landowners] even tighter limitations than [Article 1]"). The recreational use statutes appearing in Article 2 provide the following limitations on landowner duty and liability:
" ' "§ 35-15-22[, Ala. Code 1975 ].
" ' "Except as specifically recognized by or provided in this article, an owner of outdoor recreational land who permits non-commercial public recreational use of such land owes no duty of care to inspect or keep such land safe for entry or use by any person for any recreational purpose, or to give warning of a dangerous condition, use, structure, or activity on such land to persons entering for such purposes."
" ' "§ 35-15-23[, Ala. Code 1975 ].
" ' "Except as expressly provided in this article, an owner of outdoor recreational land who either invites or permits non-commercial public recreational use of such land does not by invitation or permission thereby:
" ' "(1) Extend any assurance that the outdoor recreational land is safe for any purpose;
" ' "(2) Assume responsibility for or incur legal liability for any injury to the person or property owned or controlled by a person as a result of the *244 entry on or use of such land by such person for any recreational purpose; or
" ' "(3) Confer upon such person the legal status of an invitee or licensee to whom a duty of care is owed." '
" 707 So.2d at 628-29."
Ex parte City of Guntersville, 238 So.3d 1243, 1246-47 (Ala. 2017).
Section 35-15-24, Ala. Code 1975, "carves out an exception to the liability limitations provided in §§ 35-15-22 and -23." Ex parte City of Geneva, 707 So.2d at 629. Section 35-15-24 provides:
"(a) Nothing in this article limits in any way legal liability which otherwise might exist when such owner has actual knowledge:
"(1) That the outdoor recreational land is being used for non-commercial recreational purposes;
"(2) That a condition, use, structure, or activity exists which involves an unreasonable risk of death or serious bodily harm;
"(3) That the condition, use, structure, or activity is not apparent to the person or persons using the outdoor recreational land; and
"(4) That having this knowledge, the owner chooses not to guard or warn, in disregard of the possible consequences.
"(b) The test set forth in subsection (a) of this section shall exclude constructive knowledge by the owner as a basis of liability and does not create a duty to inspect the outdoor recreational land."
The plaintiffs, relying upon the common-law duties that a landowner owed a licensee, argue that the Town is liable for Hatem's injuries because, they say, it created the hazard that resulted in those injuries by negligently hanging the swing from the tree in the park. Relying upon W.S. Fowler Rental Equipment Co. v. Skipper, 276 Ala. 593, 165 So.2d 375 (1963), the plaintiffs contend that the Town owed Hatem the duty not only of refraining from "inflicting intentional, willful or wanton injuries," but also of refraining "from exposing such licensee to new hidden dangers, such as traps, pitfalls or obstructions which arise through his active negligence." Fowler, 276 Ala. at 600, 165 So.2d at 381. The plaintiffs contend that this duty requires the landowner, if he does any positive act upon the land that creates a new danger to a person who may exercise a license upon the land, to give such licensee reasonable notice or warning of the new danger. Citing Glover v. City of Mobile, 417 So.2d 175 (Ala. 1982), and Poole v. City of Gadsden, 541 So.2d 510 (Ala. 1989), the plaintiffs further contend that this duty has not been subsumed by the recreational-use statutes and must be read in conjunction with those statutes.
In Glover, the plaintiff's two minor sons drowned while swimming in Dog River, a portion of which was located immediately adjacent to a public park operated by the City of Mobile. The park was open to the public, and the City did not charge for admission to the park. The City had constructed a pier, bulkheads, and a pavilion containing concessions and restrooms. The evidence indicated that the City had never operated a swimming facility at the park.
The plaintiff sued the City, alleging that the whirlpools occurring in front of the pavilion created a dangerous condition for those who chose to swim in the river and that the City knew or should have known of the danger to the public. The plaintiff asserted that the City should have taken reasonable steps to remove or lessen the danger posed by the river. The plaintiff also asserted that the provisions of § 35-15-1 et seq. were inapplicable to the case and were unconstitutional as applied. The *245 trial court entered a summary judgment in favor of the City.
On appeal, this Court stated that, "[a]lthough the question of the applicability of § 35-15-1 et seq. to a municipality/landowner has not been addressed by this Court, we find that any discussion of that issue here would merely be an exercise in academics." Glover, 417 So.2d at 177. Rather, this Court discussed § 35-15-1 et seq. in the context of the common-law rule set forth in Fowler, stating:
"We note that § 35-15-1 et seq., enacted by the Legislature in 1965 as Act 463, was passed:
" '[t]o clarify and codify the common law with respect to the duty of care owed by landowners towards the persons who may be upon their premises for hunting, fishing, sporting or recreational purposes and not for purposes connected with the landowner's business.'
"....
"The common law principle to which the Legislature referred in its statement of purpose for the adoption of Act 463 was well-stated in W.S. Fowler Rental Equipment Co. v. Skipper, 276 Ala. 593, 165 So.2d 375 (1963) :
" 'The duty of one who owns or is in possession of property towards a licensee is not only to abstain from inflicting intentional, willful or wanton injuries, but to refrain from exposing such licensee to new hidden dangers, such as traps, pitfalls or obstructions which arise through his active negligence. [Cites omitted.] A trap or pitfall need not be intentionally set to catch a licensee who has been using the premises. A statement to that effect in Alabama Great Southern R. Co. v. Campbell, [32 Ala. App. 348, 26 So.2d 124 (1946) ], must be read in the light of the exact holding in the case there cited, Hayward v. Drury Lane Theatre, 1917 2 K.B. 899, 914, where it was said:
" ' "... The owner is under no liability as to existing traps unless he intentionally set them for the licensee, but must not create new traps without taking precautions to protect licensee against them...."
" '....
" 'This duty does not restrict the owner or possessor's right to make use of the property or to make such changes therein as he may desire, but requires him, if he does any positive act creating a new danger to a person who may exercise the license, to give to such licensee reasonable notice or warning of the new danger or to exercise reasonable care to provide safeguards against such new danger. [Cites omitted.]'
" W.S. Fowler, at 276 Ala. 600, 165 So.2d 375.
"Both the statute and the Fowler decision were considered and approved in Wright v. Alabama Power Company, 355 So.2d 322 (Ala. 1978), wherein this Court held:
" 'As we read the Fowler decision, it stands for the proposition that a landowner will generally owe no duty to warn a licensee of a potentially dangerous condition unless he does some positive act which creates a new hidden danger, pitfall or trap, which is a condition that a person could not avoid by the use of reasonable care and skill. [Cite omitted.] Otherwise, a landowner has the right to make use of his land as he may see fit. [Cite omitted.] The licensee's entrance on the land carries with it no right to expect the land to be made safe for his reception, but he must assume the risk of whatever may be encountered.
*246 [Cites omitted.] Once he is there, the law only requires the landowner to refrain from wantonly, maliciously or intentionally injuring him; in other words, the landowner is not liable unless he does some act which goes beyond mere negligence.'
"Wright v. Alabama Power Company, at 355 So. 2d 325."
Glover, 417 So.2d at 176-78.
This Court went on to affirm the summary judgment entered in favor of the City in Glover, finding that there was no allegation that the City took some positive action that created a new hidden danger. Based on this Court's application of the common-law principles of premises liability to its analysis in Glover, the plaintiffs argue that the principle set forth in Fowler is likewise applicable to this case.
In Poole, supra, the plaintiff's son drowned at a new dock and boardwalk constructed on the Coosa River in a public park owned and operated by the City of Gadsden. The City had contracted with Scott Bridge Company to construct and erect a boardwalk and docks in the park along the banks of the Coosa River. The purpose of the project was to provide an outdoor recreational area for use by the general public in recreational activities. The project contained no provisions for swimming and diving. The City had always discouraged swimming in the area. After the boardwalk project was completed, the City had posted signs warning the public to "Swim at Your Own Risk/No Lifeguard on Duty." The plaintiff brought a wrongful-death action against the City and Scott Bridge alleging that her son drowned after diving from the boardwalk into the river and striking his head on a submerged object. The trial court entered a summary judgment in favor of the City and Scott Bridge.
The plaintiff argued on appeal that the provisions of § 35-15-1 et seq. were not applicable because, she argued, the intent of those provisions was to promote development of lands for recreational purposes and not to encourage cities to develop public parks. However, the plaintiff also contended that, if § 35-15-1 et seq. were applicable in that case, the construction of the dock and boardwalk by the City and contractor, from which members of the public could swim and dive, constituted a "positive act" that created a new "hidden danger" that did not previously exist and that the City and Scott Bridge owed a duty to at least warn of the danger created. In affirming the summary judgment, this Court stated:
"One of the plaintiff's major arguments is that the provisions of § 35-15-1 et seq., do not apply. It is quite obvious that they do. Section 35-15-21(1) defines 'Owner' as follows: 'Any public or private organization of any character, including a partnership, corporation, association, any individual, or any federal, state or local political subdivision or any agency or any of the foregoing having a legal right of possession of outdoor recreational land.' (Emphasis added.)
" Sections 35-15-1 through -5 define and limit the duties of an owner of recreational land in relation to a person using the premises for recreational purposes. An owner, whether public or private, owes no duty to users of the premises except for injury caused by a willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity.
" Sections 35-15-20 through -28, adopted in 1981, apply to owners of noncommercial public recreational land, such as the City here, and provide such landowners with even greater protections than §§ 35-15-1 through -5. It is our opinion that the City of Gadsden *247 was intended to be shielded, and was shielded, from liability, based on the facts and circumstances of this case. Cf. Clark v. Tennessee Valley Authority, 606 F.Supp. 130 (N.D. Ala. 1985) (federal district judge, applying Alabama law, found TVA not liable to a fisherman whose boat went over a spillway); Grice v. City of Dothan, 670 F.Supp. 318 (M.D. Ala. 1987) (Alabama's recreational and outdoor land statute was not subject to an exception for minors, and the City of Dothan was shielded from liability because of statute's provisions)."
Poole, 541 So.2d at 512-13.
After determining that the City was protected from liability by the recreational-use statutes found in § 35-15-1 et seq., this Court undertook a discussion of the case in light of the holding in Glover and its discussion of the common-law principle set forth in Fowler. The Court ultimately concluded that, "[e]ven if plaintiff had any evidence to prove her claim that defendants created a hazardous condition by failing to remove submerged objects, the law would still require a summary judgment in this case. Many Alabama summary judgment cases have involved hazardous conditions hidden by water." Poole, 541 So.2d at 513. Based on the discussion of Glover in Poole, the plaintiffs rely on Poole in support of their contention that the recreational-use statutes must be read in conjunction with the common-law principle of Fowler.
The decisions in Glover and Poole do not support the plaintiffs' contention that the common-law principles of premises liability -- particularly the rule set forth in Fowler regarding the creation of a hidden danger -- were subsumed by the recreational-use statutes and must be read in conjunction with those statutes. In Poole, this Court expressly stated that Article 2, i.e., §§ Sections 35-15-20 through -28, of the recreational-use statutes was applicable to the City in that case and shielded the City from liability on the plaintiff's claim that the City had created a hidden danger by constructing the dock and boardwalk and failing to remove submerged objects. Any discussion of the holding in Fowler was dicta and is not binding in subsequent cases. Ex parte Williams, 838 So.2d 1028, 1031 (Ala. 2002) ("Because obiter dictum is, by definition, not essential to the judgment of the court which states the dictum, it is not the law of the case established by that judgment.").
As explained above, this Court, in Glover, discussed Article 1, i.e., §§ 35-15-1 through -5, of the recreational-use statutes in the context of the common-law principle set forth in Fowler in deciding that case. However, the discussion and holding in Glover has no operation in the present case, which is governed by Article 2 of the recreational-use statutes.
Article 1 was enacted in 1965 specifically
"[t]o clarify and codify the common law with respect to the duty of care owed by landowners towards the persons who may be upon their premises for hunting, fishing, sporting or recreational purposes and not for purposes connected with the landowner's business."
Act No. 463, Ala. Acts 1965. Section 35-15-1 provides:
"An owner, lessee, or occupant of premises owes no duty of care to keep such premises safe for entry and use by others for hunting, fishing, trapping, camping, water sports, hiking, boating, sight-seeing, caving, climbing, rappelling, or other recreational purposes or to give any warning of hazardous conditions, use of structures or activities on such premises to persons entering for *248 the above-stated purposes, except as provided in Section 35-15-3."
Section 35-15-2, Ala. Code 1975, provides:
"An owner, lessee, or occupant of premises who gives permission to another to hunt, fish, trap, camp, hike, sight-see, cave, climb, rappel, or engage in other sporting or recreational activities upon such premises does not thereby extend any assurance that the premises are safe for such purpose nor constitute the person to whom permission has been granted the legal status of an invitee to whom a duty of care is owed or assume responsibility for or incur liability for any injury to person or property caused by an act of such person to whom permission has been granted, except as provided in Section 35-15-4."
Section 35-15-3, Ala. Code 1975, provides:
"This article does not limit the liability which otherwise exists for wilful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity; or for injury suffered in any case where permission to hunt, fish, trap, camp, hike, cave, climb, rappel, or sight-see was granted for commercial enterprise for profit; or for injury caused by acts of persons to whom permission to hunt, fish, trap, camp, hike, or sight-see was granted to third persons as to whom the person granting permission, or the owner, lessee, or occupant of the premises owned a duty to keep the premises safe or to warn of danger."
Sections 35-15-1 through -5, Ala. Code 1975, define and limit the duties of a landowner in relation to persons upon the landowner's premises for recreational purposes. The owner of recreational land, whether public or private, owes no duty whatsoever to provide safe premises to the recreational users of the owner's land. Sections 35-15-1 through -5 recognize "only potential liability 'which otherwise exists for willful or malicious failure to guard or warn against a dangerous condition, use, structure or activity ....' " Clark v. Tennessee Valley Auth., 606 F.Supp. 130, 131 (N.D. Ala. 1985).
In 1981 the Alabama Legislature enacted Article 2 of the recreational-use statutes, consisting of §§ 35-15-20 through -28. Unlike Article 1, Article 2 applies specifically to "owners" of noncommercial public recreational land, such as the Town in this case. Ex parte City of Geneva, supra. Section 35-15-21(1) defines "Owner" as "[a]ny ... state or local political subdivision ... having a legal right of possession of outdoor recreational land." Article 2 provides noncommercial public recreational landowners "with even tighter limitations than §§ 35-15-1 through 5, as to their exposure to liability to recreational users." Clark, 606 F.Supp. at 131. "This 1981 piece of legislation recognizes a public policy in Alabama to encourage public owners to allow the opening up and promotion of their facilities without exposing themselves to law suits." Clark, 606 F.Supp. at 131. The cases relied upon by the Court in Glover -- Fowler and Wright -- both predate the enactment of Article 2.
Section 35-15-23(3) of Article 2 states that, "[e]xcept as expressly provided in this article, an owner of outdoor recreational land who either invites or permits non-commercial public recreational use of such land does not by invitation or permission thereby: ... (3) Confer upon such person the legal status of invitee or licensee to whom a duty of care is owed." (Emphasis added.) Section 35-15-23(3) expressly abrogates the common law in situations where the owner of outdoor recreational land invites or permits persons upon the land for the noncommercial recreational use of the land. In those cases, the landowner *249 does not confer upon such person a legal status and a concomitant common-law duty of care. The lone exception to this rule is found in the four-part test contained in § 35-15-24 set forth above and discussed in greater detail infra. Because § 35-15-23(3) expressly abrogates the common-law duties owed by owners of recreational lands to persons who come upon the lands for a noncommercial recreational purpose, the common-law rule set forth in Fowler as discussed in Glover and relied upon by the plaintiffs has no applicability to this case.
2. Liability Under § 35-15-24
Because the Town's liability is limited under §§ 35-15-22 and -23, it was incumbent upon the plaintiffs to present substantial evidence of each element of the exception to those liability limitations found in § 35-15-24. Ex parte City of Guntersville, supra. The Town argues that the plaintiffs failed to establish that it had actual knowledge that the swing presented an "unreasonable risk of death or serious bodily harm." § 35-15-24(a)(2). We agree.
In this case it is undisputed that the Town had knowledge of the existence of the swing suspended from the tree limb, because the Town's public-works department hung the swing. However, there is no evidence, much less substantial evidence, indicating that the Town had actual knowledge that the swing presented an "unreasonable risk of death or serious bodily harm" to the public. William Green, the property owner and lessor of the property to the Town, stated that, once he became aware of the existence of the swing, he did not want anything to happen to the tree "cosmetically" and that he was not "concerned about [the tree] being damaged." William stated that he did not have any "knowledge of the condition of the tree or swing" and that there "wasn't any immediate concern on [his] part. [He] just wanted to know what was going on and why the swing was there."
Collier testified that, when William's concerns were conveyed to him through Phillips, he assumed that William was referring to the "potential scraping or chafing" of the bark on the limb by the chain from which the swing was suspended. Collier stated that at no time during his conversation with Phillips did they discuss the safety of the swing and the tree in terms of the swing causing the limb from which it was suspended to break.
Based on his conversation with Phillips, Collier asked Moore to inspect the swing. Moore inspected the swing the day after Collier had informed him of William's concerns and stated that the tree limb "did not look damaged at all" to him. Moore testified that because William had concerns that the swing might injure the tree, he instructed his crew to take the swing down when they got a "chance."
Nothing in the foregoing could possibly be construed as substantial evidence indicating that the Town had actual knowledge before the incident made the basis of this complaint that the swing and tree limb from which it hung posed an "unreasonable risk of death or serious bodily harm." At best, the evidence indicates that the Town was aware of the potential cosmetic damage to the tree the suspension of the swing from the limb might cause.
The plaintiffs further rely upon the deposition testimony of Rogers and say that her testimony alone is sufficient to create a fact question as to whether the Town was aware of the dangerous condition presented by the swing and the limb. Rogers stated that following the accident she had a telephone conversation with an unidentified female employee of the Town who was at the scene. Rogers stated that the employee told her that the Town "knew there was a problem with the trees and they *250 were -- didn't have time to get to it to take care of the situation and they was going to take care of it." When Rogers was asked if that person stated why the Town was going to address the trees, Rogers responded that "[s]he just told me that the -- there was a problem with the swings and the trees and they needed to come down. They just haven't had time to get to it."
We note that Rogers's testimony referred to the "swings" and "trees" in the plural and did not specifically reference the swing and tree at issue. Further, Rogers's testimony referred only to the trees and swings as having some unspecified "problem" without referencing a specific "condition [that] ... exist[ed] which involve[d] an unreasonable risk of death or serious bodily harm." § 35-15-24(a)(2). Finally, we note that § 35-15-24(a)(4) can be satisfied only where the owner has actual knowledge of the dangerous condition described in § 35-15-24(a)(2) and with that knowledge "chooses not to guard or warn, in disregard of the possible consequences." Rogers testified that the unidentified Town employee had told her that they simply "just haven't had time to get to it." Nothing in Rogers's testimony suggests that, even if the Town had actual knowledge of the condition presented by the swing and tree limb, it made the deliberate choice not to guard or warn against the condition.
Rogers's testimony at best establishes that the Town had only constructive knowledge of some unknown problem with a tree and swing located in the park and that the Town had not yet had time to address it. "In order for liability to be imposed under [ § 35-15-24 ], it must be shown that the landowner had actual knowledge of each of the elements listed above and, with that actual knowledge, chose not to guard or warn against the danger. Constructive knowledge is not sufficient." Martin v. City of Gadsden, 584 So.2d 796, 797-98 (Ala. 1991). Accordingly, Rogers's testimony fails to satisfy the requirements of § 35-15-24.
The plaintiffs also presented the expert testimony of Chris Francis, an arborist. Francis first inspected the tree in February 2017, approximately three years and three months after the accident. Francis testified that the method used by the Town to hang the swing from the limb was improper. He stated that wrapping a chain around a limb as was done here affects the vascular function of the limb, contributes to decay, and weakens the structural integrity of the limb. Francis further testified that the placement of the swing on the limb, approximately 10 to 12 feet beyond the point of the break, was improper because it increased the leverage placed on the limb. In other words, Francis opined that the swing was hung too far out on the limb. However, Francis was unable to express an opinion as to what defect caused the tree limb to fail. Francis stated that a defect can exist in a tree and not be readily apparent to someone looking at the tree limb from the ground. Francis further testified that he could not state whether the defect in the tree limb that caused it to fail would have been apparent to someone looking at the tree from the ground. Suffice it to say that nothing in Francis's testimony remotely suggests that the Town had actual knowledge of "a condition ... [that] exist[ed] which involve[d] an unreasonable risk of death or serious bodily harm." § 35-15-24(a)(2).
Conclusion
Based on the forgoing, we conclude that the Town has established a clear legal right to the relief sought. We grant the petition for a writ of mandamus and direct the Mobile Circuit Court to set aside its order denying the Town's motion for a summary judgment based on the recreational-use statutes found in *251 § 35-15-1 et seq., Ala. Code 1975, and to enter a summary judgment in the Town's favor on the claims brought by the plaintiffs.
PETITION GRANTED; WRIT ISSUED.
Stuart, C.J., and Parker, Main, Wise, Sellers, and Mendheim, JJ., concur.
Shaw and Bryan, JJ., concur in the result.

Hall stated that she did not know who informed Rogers of Hatem's injury. Rogers testified that Hatem was able to contact Tonya O'Neal, Rogers's sister, by cellular telephone and notify her of the accident, and that O'Neal in turn contacted Rogers.

Section 35-15-21(1), Ala. Code 1975, defines "Owner" as "[a]ny public or private organization of any character, including ... any federal, state, or local political subdivision ... having a legal right of possession of outdoor recreation land." The Town is construed as the "owner" for purposes of § 35-12-21(1) pursuant to the lease with W & S Green.